Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

-----------

IN RE:                          )
                                )
MARK STEPHEN NEIGHBORS and )  Case No. 11-21003
SHELLY KAY NEIGHBORS,           )
                                )
              Debtors.          )
                                )

-----------

THE ABOVE-ENTITLED MATTER, came on for hearing before the Honorable Dale L. Somers, United States Bankruptcy Judge, pursuant to notice, on Tuesday, September 27, 2016, beginning at 9:30 a.m, at the Robert J. Dole Federal Courthouse, 500 State Avenue, Kansas City, Kansas, and the following proceedings were had:

-----------

A P P E A R A N C E S :

On Behalf of the Debtor:
Law Office of Camron Hoorfar, PC
202 SW Market Street
Lee's Summit, Missouri 64063
By Camron L. Hoorfar, Esq.

On Behalf of the Trustee:
Office of the U.S. Trustee
301 North Main, Suite 1150
Wichita, Kansas 67202
By Richard A. Wieland, Esq.

On Behalf of CitiMortgage:
Spencer Fane LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64105
By Eric L. Johnson, Esq.
Kersten Holzhueter, Esq.

On behalf of Bank of Versailles:
Brown & Ruprecht, PC
2323 Grand Boulevard, Suite 1100
Kansas City, Missouri 64108
By Frank Wendt, Esq.

On behalf of the Trustee:
Stevens Brand
515 S. Kansas Avenue
Topeka, Kansas 66603
By Patricia Hamilton, Esq.

WITNESS INDEX

|                 | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------------|--------|-------|----------|---------|
| MARK NEIGHBORS  | 55     | 113   | 156      | 164     |


EXHIBITS                        PAGE
Stipulated Exhibits S1 through 273 admitted.... 5
Debtors' Exhibits, 1, 2, 6, 7, 8, 9, 10,
   11, 12, 13l 19, 20, 21, 28 admitted....... 54
CitiMortgage Exhibits C1, C2 and C3............ 86
Trustee's Exhibit T2 admitted.................. 137
CitiMortgage Exhibit C4 admitted............... 160

PROCEEDINGS

THE COURT: Good morning.

THE CLERK: Calling Case 11-21003, Mark and Shelly Neighbors.

THE COURT: Appearances, please.

MR. HOORFAR: Good morning, Your Honor, Camron Hoorfar on behalf of the Debtors. The Debtors also appear in person.

MR. JOHNSON: Good morning, Your Honor, Eric Johnson and Kersten Holzhueter, on behalf of CitiMortgage.

MS. HAMILTON: Good morning, Your Honor, Patricia Hamilton, Trustee.

MR. WENDT: Good morning, Your Honor, Frank Wendt for Bank of Versailles.

MR. WIELAND: Good morning, Your Honor, Dick Wieland for the United States Trustee.

THE COURT: Very good. Well, I appreciate all the effort for the stipulations on the facts and the exhibits. That was very commendable of everybody.

And I think with that, if there aren't any preliminary matters we need to take care of, I'm assuming that all -- well, I'll ask one question. With regard to the stipulated exhibits

and -- or the joint exhibits, are they stipulated to both as to foundation and to admission?

MR. JOHNSON: Yes, Your Honor. In the pretrial, we stipulated to the admission and I was going to raise to admit them into the record as far as stipulated exhibits, I think 1 through whatever stipulated exhibits.

MS. HAMILTON: I think that's correct, Your Honor, 1 through 74.

MR. JOHNSON: Thanks.

THE COURT: And of course the fact that they are stipulated to, they're all admitted.

(Joint Exhibits 1 through 78 received in evidence.)

THE COURT: So with that, are there any opening statements?

Mr. Wendt.

MR. WENDT: Your Honor, Bank of Versailles has filed a limited response only and our client doesn't take a position in dismissal or continuation of Chapter 7. But if dismissed, we would respectfully ask the Court that it be conditioned with specific language that all prior orders remain binding. Given the extent of litigation, in the event the case is dismissed

1  and any action is filed in state court, I think
2  it behooves us and the process to make sure that
3  the status is clear, of litigation. And with
4  that, Your Honor, I would ask if I could be
5  excused, because, otherwise, we don't have any
6  issue.
7      THE COURT: You may be. Thank you.
8      MR. WENDT: Thank you, Your Honor.
9      THE COURT: Very good. Now,
10 Mr. Hoorfar.
11      MR. HOORFAR: Yes, Your Honor. Good
12 morning. Before we dive in, I just wanted to
13 give a brief outline as to what we're doing here
14 today, hopefully clear up any misunderstandings
15 that there might be, if any, and just kind of
16 talk specifically about what we're doing today
17 because it is a very specific limited matter.
18      The Debtors have filed a motion to
19 dismiss their Chapter 7 bankruptcy and that was
20 under the statutes of 707(a) and 305(a).
21      The purpose of today is to handle the
22 305(a) which is essentially what I'm going to
23 refer to as the two-party dispute.
24      That is our -- under 305(a), that's the
25 main argument that the Debtors have, is

1  essentially that this is a two-party dispute and
2  that if there are any -- there are no unsecured
3  or any other creditors, but if there are, they're
4  insignificant, and it doesn't matter anyway.
5      But the purpose of today is just to go
6  over the 305(a) motion to dismiss that the
7  Debtors have filed and the factors that
8  correspond to that as well as essentially how
9  many people are left in this case.
10      THE COURT: Very good. Thank you.
11 Mr. Johnson.
12      MR. JOHNSON: Your Honor, I think
13 Mr. Hoorfar has broadened the hearing a little
14 bit on 305(a).
15      I think the legal issue that was
16 stipulated and as we had a telephone conference
17 on yesterday was whether or not the Court is
18 required to dismiss under 305(a) to the extent
19 it's determined that there is only one
20 prepetition claimholder and postconversion
21 administrative expense claims.
22      That is the legal issue.
23      The factual issue is whether in
24 addition to the claims of Citi and the Trustee,
25 other claims currently exist. That's the limited

1  issues that were stipulated to in the order that
2  the Debtors signed off on.
3      So I think it's even a more narrow
4  issue. And I would agree with Mr. Hoorfar on
5  that, that it is a very narrow reason that we're
6  here.
7      And I think on the factual issue, the
8  Debtors have already stipulated that more than
9  Citi's claims exist. Indeed, there's still a
10 live claim regarding Nationstar Mortgage, see
11 stipulated fact number 56.
12      Also, we believe that the testimony of
13 the Debtors' will be enlightening as to whether
14 other prepetition claims other than Citi and
15 Nationstar exist, including the circumstances
16 regarding those withdrawals.
17      With respect to the legal argument on
18 whether or not this Court is required to dismiss
19 if there's only one claim, first, this is the
20 Debtors' burden. They have the burden of proof
21 on this motion whether it's under 707(a) or
22 305(a).
23      Further, as the Court knows, you have
24 wide discretion on these matters, especially on
25 matters of abstention.

1      Once again, the legal issue before the
2  Court is whether existence of a two-party dispute
3  requires the Court to dismiss the case, and the
4  answer is simply no.
5      Courts reviewing motions under, whether
6  it be 707(a) and 305, you generally look at a
7  variety of factors which, in many respects, ask a
8  lot of the same questions.
9      But with respect to 305, this Court,
10 Your Honor, recognized in the Starlight
11 Houseboats, where adherence to a strict set of
12 factors in the legislative history should be
13 rejected, and in rejecting that previous case by
14 Judge Franklin, the Court stated: Only by
15 considering all of the relevant circumstances of
16 the case can the Court make a sound decision
17 whether a particular case presents the rare
18 circumstance where dismissal is appropriate.
19      While the existence of a two-party
20 dispute can be a factor in dismissal, to the
21 extent it's demonstrated, it does not require the
22 Court to dismiss; indeed, a factor that Courts
23 give greater weight to is prejudice to creditors,
24 which is demonstrated by the case the Debtors
25 originally cited, the Dyeworks B case (PHONETIC).

1 And in that case, the Court specifically found
2 the fact that a creditor had 99 percent of the
3 claims did not mandate dismissal.
4     Further, in their own motions and
5 settlements, the Debtors cite to two cases the
6 Kirby vs. Spatz case at 221 BR 929 and In Re:
7 Bose case (PHONETIC) which is an unpublished
8 case, and that was cited their supplement.
9     Both of those the Courts rejected that
10 the Court was compelled to dismiss a case because
11 it was a two-party dispute. You have to look at
12 all the factors. And once again, we are here on
13 whether or not there are other claims that are in
14 existence and on that narrow legal issue.
15     I would also note that in this case,
16 unlike many of the cases cited by the Debtors,
17 this did not start as a two-party dispute. This
18 started as a full blown Chapter 11 with multiple
19 creditors and has lasted five years.
20     Unlike a lot of the cases where you
21 have 305 abstention whether it be an involuntary
22 case or a voluntary case on the two-party
23 disputes, usually the two-party dispute was
24 present at the beginning of the case.
25     So in that respect, many of the cases

1 relied upon by the Debtors are distinguishable.
2     Once again, the stipulated evidence
3 already shows that there's more than one claim
4 holder than Citi. But even if Citi exists, only
5 Citi exists, the Court should review the entire
6 circumstances of the case and to answer that
7 question before the Court -- answer that
8 question.
9     And once again, for purposes of today,
10 we're not talking about all the circumstances,
11 we're talking about what creditors exist other
12 than Citi which has, once again, been stipulated
13 to, that Citi exists for purposes of today.
14     So with that, Your Honor, if you have
15 no questions before we start, I'll -- it's
16 Mr. Hoorfar's motion, or I'll turn it over to the
17 Trustee. Thank you.
18     MS. HAMILTON: Your Honor, I would
19 agree that this is the Debtors' burden. And I
20 would note for the record that since my
21 appointment in this case, I have met with a
22 number of hurdles which I believe have been
23 placed in my path by the Debtors.
24     I understand the Debtors' unhappiness
25 with being in this Chapter 7 case, but that does

1 not relieve them of their duties to provide
2 information to the Trustee. And quite frankly,
3 Your Honor, this hearing wouldn't be necessary,
4 in my opinion, if the Debtors had cooperated.
5     As we discussed yesterday during that
6 short telephone conference, to this day I have
7 yet to see a copy of a settlement agreement with
8 one of the major creditors in this case.
9     I have, however, seen bank statements
10 showing that Mr. and Mrs. Neighbors obtained the
11 funds from the settlement that they reached with
12 Nationstar and they spent those funds exactly as
13 they determined without court approval, without
14 notice to creditors.
15     So we're here today again on the
16 Debtors' motion asking for what I consider to be
17 extraordinary relief under these circumstances.
18     The Debtors have been in a bankruptcy
19 for years. They've benefited tremendously from
20 the bankruptcy stay that prevented creditors from
21 moving forward. And, quite frankly, what I have
22 discovered as the Trustee is that there's a lot
23 of confusion among creditors between Neighbors
24 Investment, which does have a confirmed plan, and
25 Neighbors individual case.

1     Part of the confusion, I think the
2 evidence will demonstrate, is because Mark and
3 Shelly Neighbors took their own personal income,
4 didn't report it in their person case and used it
5 in Neighbors Investment.
6     So there are a number of creditors in
7 Neighbors Investment who have received payments
8 from the personal assets of Mark and Shelly
9 Neighbors to the detriment of the creditors of
10 Mark and Shelly Neighbors individually.
11     And again, all of this has happened, it
12 appears to me -- and I think the evidence will
13 bear this out -- because Mark and Shelly
14 Neighbors have determined how they wanted to
15 proceed. At times, they may have abided by
16 provisions of the bankruptcy code but many other
17 times, they chose not to.
18     And now that they've come quite frankly
19 to the end of the road, Your Honor has issued a
20 decision which they do not support, do not agree
21 with, which is that there's a mortgage on the
22 lakehouse and they would like to proceed with
23 litigation in state court.
24     Again, I understand why they have that
25 desire, but that is not within the realm of the

1 cases that support dismissal in two-party
2 disputes and it certainly is not supported in the
3 facts of this particular case, considering the
4 history of the case.
5     So with that, Your Honor, I'd ask that
6 at the conclusion of the presentation of evidence
7 that the Court deny that motion.
8     THE COURT: Mr. Hoorfar.
9     MR. HOORFAR: Thank you, Your Honor.
10 Well, I think we may need to clear some things
11 up, then, because apparently we're not as clear
12 as what we were discussing today as we originally
13 had hoped.
14     I heard CitiMortgage counsel stating
15 that we are only talking about whether or not
16 there's a two-party dispute, and then he lists
17 that there are other factors to consider. We are
18 more than happy to discuss those factors. I
19 think his point was that he did not, but yet he
20 brings them up.
21     And then the Trustee just stated a lot
22 of things that are outside the scope of whether
23 or not there are more than one creditor.
24     The Trustee just brought up actions by
25 the Debtor that she believes are incorrect.

1 There was statements about whether or not the
2 Debtors have done something that violated the
3 Bankruptcy Code or whether or not that they had
4 settlements that were approved.
5     And so we are prepared to talk about
6 all those things, Your Honor, but I believe that
7 we have just now -- the scope that we're talking
8 about today is fluctuating and I think it may be
9 helpful to confine us to what we're discussing.
10     MR. JOHNSON: Your Honor, may I address
11 that?
12     THE COURT: Yes, please.
13     MR. JOHNSON: In the context of what
14 both I and the Trustee said on a factual, if
15 we're trying to figure out what claims exist, we
16 have to know why these claims were withdrawn and
17 we have to know the circumstances behind those
18 withdrawals to see if these creditors can still
19 pursue these claims or will pursue these claims
20 if there's contingent claims or otherwise, so
21 that's why we have to understand what creditors
22 exist.
23     As to my listing of other factors, that
24 just points to the legal issue. We don't have to
25 go into those factors, but I think you can't

1 answer the question of are you required without
2 knowing what the overall context of the question
3 is.
4     THE COURT: What I'm hearing is based
5 upon the pretrial order and what you-all talked
6 about yesterday, what I'm hearing is that if I
7 find that the only thing that is being tried
8 today, which is incredibly narrow, is if I find
9 that there is only one creditor, which would be
10 CitiBank at the present time, then I am required
11 to determine whether or not it is mandatory that
12 I dismiss the case if there's only one creditor.
13     And if I find that there are two
14 creditors or if I find that it is not mandatory,
15 then we have another hearing on all other issues,
16 which is not what I envisioned. I envisioned
17 this trial being the broader scope, quite
18 frankly, which is kind of why I had the
19 conference yesterday, because -- but that's not
20 what the pretrial order says.
21     I mean, the pretrial order says the
22 only issue in front of me is is there one
23 creditor, which there I agree, then we -- the
24 evidence may well have to explain where these
25 people went to, because it is stipulated that at

1 the end of the bar date in the Chapter 11, there
2 were 25 claims filed. That's stipulated.
3     So there was at least 25 people who at
4 one point felt like they had some kind of claim.
5 I think there were significantly more than 25
6 listed when the bankruptcy schedules were filed.
7     When the Chapter 11 schedules were
8 filed, I think there were significantly more than
9 25, although I haven't specifically counted them
10 lately.
11     And I think it is within the scope of
12 this hearing to examine, to a certain extent,
13 what happened to all these other creditors, and
14 it certainly is within the scope of this hearing
15 about the status of Nationstar. But that
16 pretrial order basically says the only thing is
17 in my -- the legal issue before us today is am I
18 required to dismiss this case if I find there's
19 only one creditor.
20     MR. JOHNSON: Your Honor, that's our
21 understanding. And from the earlier August
22 hearing, it was when we were talking about
23 whether or not there should be a bifurcated
24 hearing which Mr. Hoorfar suggested, and that was
25 really this two-party dispute issue that was

Heritage Reporting Service    www.heritagekcmo.com    Page: 5
Case 12-21003   Doc# 678-1   Filed 10/21/16   Page 5 of 44
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701

1 preserved. And I think the question is, A, is
2 this really a two-party dispute; and, B, what
3 does that mean, and all the other issues would be
4 preserved for a later hearing.
5 So I think you are right, the pretrial,
6 it is very narrow and I think how you've outlined
7 the scope is what we were intending to stay
8 within as far as the creditors and how we got
9 here.
10 But as far as the legal issue is
11 whether or not the fact that it's a two-party
12 dispute requires you to dismiss, and we believe
13 that there are other factors that need to be
14 taken into consideration.
15 THE COURT: Right, I understand that
16 and I think that's probably a legitimate. I
17 mean, I think identifying the other factors is
18 legitimate, but we're not taking evidence on
19 these other factors. I mean, it's a legal
20 dispute as to whether I am required to dismiss
21 it, and "required" means I have no discretion to
22 dismiss it. What's the exact wording? I think
23 the exact wording in the pretrial order is
24 "required."
25 MR. JOHNSON: Yes, whether the Court is

1 required to dismiss.
2 THE COURT: And "required" in my world
3 means mandatory, no options, no discretion, black
4 and white, no gray.
5 MR. JOHNSON: That's my understanding
6 as well, Your Honor.
7 THE COURT: Mr. Hoorfar? You can
8 respond to this conversation.
9 MR. HOORFAR: Thank you, Your Honor.
10 In both our motion to dismiss and our supplement
11 to the motion to dismiss, we do identify six
12 factors that many different courts in many
13 different jurisdictions say that need to be
14 looked at when looking at a 305(a) two-party
15 dispute. And we have listed those, Your Honor.
16 The purpose of today, and the real
17 reason for the bifurcation originally when I
18 asked, it was to have just the 305(a) versus the
19 707(a), and we have narrowed that down even more
20 to whether or not there are one or more
21 creditors.
22 Now, I think that either way, whatever
23 is decided today, we are going to be -- we'll
24 have substantial efforts moving forward because
25 if there are other claims, then we will deal with

1 them. If there are no other claims, then I think
2 it's pretty straightforward from there.
3 But the exact wording, Your Honor, and
4 I don't know if you're looking at Section 305(a)
5 or not, but basically the requirements of Section
6 305(a) are notice, motion to dismiss, a hearing
7 on the motion to dismiss and whether or not the
8 interests of the creditors and the debtor would
9 be better served by the dismissal or a
10 suspension, and I think that's the wording of
11 305(a), Your Honor. And then from there, there
12 are many different courts obviously that we've
13 outlined that have the factors.
14 So I agree with this Court, if
15 CitiMortgage is the only creditor and there are
16 no other creditors, then this is a pretty
17 streamlined process. We certainly can talk about
18 those other factors today. And if not, if that's
19 to the Court's liking, to get this all done in
20 one, if the Court does not want to do that,
21 that's fine with us, too.
22 THE COURT: I'm not sure that's fair.
23 I mean, you know, I don't think that's fair
24 because that's not what either side came prepared
25 to do today based on this pretrial order, or

1 should have come prepared to do today.
2 I mean, I wish that's where we were,
3 but, you know, I -- but I have the pretrial
4 order, it came -- and I'm absolutely not critical
5 of anybody, you know, the order came really late
6 in the game. And -- but I think, you know, I
7 think there's latitude to get into whether there
8 are other creditors, and what happened to them.
9 I think that's fair. It's just if
10 they're gone -- and I will say if they're gone --
11 then the question is legally am I required to say
12 this case is over.
13 So let's proceed. It may get a little
14 fuzzy around the edges, but I can work my way
15 through that. So call or not call your -- please
16 proceed in the manner in which you wish to
17 proceed.
18 MR. HOORFAR: Thank you, Your Honor.
19 We do not intend on calling Mark and Shelly
20 Neighbors to testify. I know the joint pretrial
21 order stated that we had them as witnesses as
22 well as the appraisers. Essentially, Your Honor,
23 they were listed for any rebuttal purposes for
24 CitiMortgage or the Trustee's arguments.
25 But for the purposes of today and going

1 through the claims register and showing whether
2 or not CitiMortgage is the only one left
3 standing, I do not need their testimony, Your
4 Honor.
5 So if we can begin, I'd like to just
6 really jump into the claims register at this
7 point. And the first exhibit that the Debtors
8 have is labeled Debtors' Exhibit 1, Your Honor.
9 This would be in the book that the Debtors
10 provided not in the joint stipulated book. It
11 should be a smaller version. Hopefully it's
12 tabbed.
13 THE COURT: I have it right here.
14 MR. HOORFAR: Debtors' Exhibit 1 is a
15 chart prepared by my office that goes through a
16 certain time line -- and I'll outline those -- of
17 what happened in the claims register and where,
18 in fact, who fell off and at what point.
19 And it starts with, Your Honor, I blew
20 it up for everybody to view here in the chart to
21 my left here, but it starts with May 13, 2011.
22 This is where the Debtors filed and listed on
23 their schedules 16 creditors.
24 Now, it's important to note for this
25 chart that that's not 16 claims. So, for

1 example, CitiMortgage is before this Court, so
2 CitiMortgage has filed three proofs of claim. I
3 counted them as one creditor for the purposes of
4 this chart.
5 So there are 16 different creditors
6 listed by our count based on the petition.
7 And then on November 2nd, 2011, which
8 is after the claims registry has run, now if we
9 can -- I'll point out that the first initial
10 proof of claims deadline was actually on
11 August 15th of 2011, that's when the first
12 Chapter 11 proof of claim deadline expired. So
13 that expired August 15, 2011.
14 On November 2nd, you see on the chart
15 it drops 14.
16 Now, what happened was the loss of
17 Cornerstone CPA and Erickson Solutions.
18 Now, they didn't actually -- those two
19 creditors didn't actually do anything. They were
20 originally listed in the Debtors' schedules as
21 disputed. The proof of claim deadline ran and
22 they did not file a proof of claim and we lost
23 those two creditors, in our view, and we get to
24 14.
25 Then on November 18, 2011, it falls

1 again, so we go down to 12.
2 On November 18th, 2011, between --
3 these are between dates. Between November 2nd
4 and November 18th, we had the withdrawal of Bank
5 of Lake of the Ozarks. And they had four claims
6 that they withdrew, 20, 21, 22 and 23.
7 And then we had the amendments of the
8 IRS claim 11, which amended their claim to say
9 zero was due.
10 That gets up to November 18th.
11 We move forward in the case to March
12 2nd, 2012, where we fall one more creditor to 11,
13 and that's where we lose Cornerstone Bank.
14 Now, Cornerstone Bank actually withdrew
15 three claims at that time, two, three and four.
16 But because they're one creditor, we went down
17 one.
18 On October 14th, 2014 -- so a lot of
19 time has passed since, then we jump up two
20 years -- we lose two more, and that's with
21 withdrawal of two of the three of Farmers Bank s
22 claims, 6 and 24. And then we have Bank of
23 Versailles with the withdrawal of their claim 16
24 and 17.
25 Now, this is going to be a dispute

1 between the parties, obviously, but on
2 September 14th, 2015, we lose one more creditor.
3 And the Debtors' view that is the loss of
4 Nationstar because of the settlement, and we'll
5 get into that later on.
6 But for the purposes of this chart,
7 that's approximately when that settlement
8 occurred.
9 On February 5th, moving forward, 2016,
10 we actually jump up one creditor. So throughout
11 this entire case, you'll see the chart only goes
12 up once and that creditor is the U.S. Trustee.
13 The U.S. Trustee actually filed claim 26 alleging
14 that post-conversion there were some fees -- I'm
15 sorry, pre-conversion of the Chapter 11 case,
16 there were fees outstanding. They filed a proof
17 of claim. The Debtors took care of that later on
18 which we will see on the next date.
19 So June 2nd, moving forward, 2016, we
20 fall down to five creditors.
21 Now, what happened in time is
22 withdrawal of Morgan County, claim number nine.
23 Now, what's happened with this withdrawal is that
24 the Debtor filed something on his own behalf with
25 the claims registry withdrawing that. We later

1  file an objection to strike that which it was
2  stricken, but for these purposes, it is stated
3  and alleged that it was zero owed and withdrawn
4  as of that date.
5      So on June 2nd, we have a withdrawal of
6  Morgan County which is claim number nine.
7      We then have the same occurrence for
8  the claim of Mark Murphy, claim number 12. And
9  Graves Bartle, claim number 18, same thing.
10      And then the U.S. Trustee acknowledges
11  that they're paid in full and they withdraw their
12  claims.
13      So that gets us down to five as of June
14  2nd. Again, not claims but creditors
15  outstanding.
16      On July 15, 2016, we have a -- so very
17  recently -- we have the withdrawal of First
18  Federal Bank and they withdrew all three of their
19  claims, 13, 14 and 15.
20      So that brings us down to four at that
21  time.
22      On July 21st, roughly one week later,
23  we fall two more. And that is the order striking
24  the Toyota claim, which is claim number one, and
25  the order striking Private Bank claim number

1  eight.
2      Now, there were other orders striking
3  Mark Murphy and Grave Bartle and those are in the
4  joint exhibits, but we've previously counted them
5  on June 2nd so they're not counted here for this
6  chart that we've made.
7      So on July 21st, 2016, the two
8  remaining creditors are CitiMortgage with three
9  claims, and Farmers Bank with one claim.
10      Now, on September 8, 2016, Farmers Bank
11  withdrew their claim, claim number five, leaving
12  only CitiMortgage in the claims registry with
13  having -- whether or not they're disputed, we are
14  not talking about that today -- but filed proofs
15  of claim. I believe they're claim number seven,
16  claim number ten and claim number 25.
17      So based upon this chart, which I have
18  gone through the work of going through all of the
19  claims registry and doing as best we could as
20  making this as visually pleasing for the Court as
21  possible, you can see that as of September 8 when
22  Farmers Bank withdrew their last claim number
23  five, we are left with what we allege is one
24  creditor.
25      Now, Your Honor, to further go into

1  what happened in this case and to give the Court
2  an idea as to the roughly five years -- well,
3  well over five years now, actually -- of activity
4  that's gone on in the case, I present to the
5  Court Debtors' Exhibit Number 2.
6      Number two, at the very top, Your
7  Honor, is entitled, 2011 Creditor Activity.
8      Now, there should be a couple of pages
9  here. And if I can approach my chart, I'm going
10  to flip the page for the Court to see.
11      This is actually -- I'm sorry, this is
12  actually a chart, Your Honor, again created by my
13  office in an attempt to go over the bountiful, if
14  I can say that, activity of this docket.
15      What this chart entails is actually any
16  entries for any creditors -- now, we're not --
17  we're not including the Chapter 7 Trustee and
18  we're not including the U.S. Trustee, for the
19  purposes of this chart that I have made, we go
20  through any entries of appearance, any sort of
21  document filed with the Court no matter what that
22  document is, any court appearances based on the
23  courtroom minute sheets, and any withdrawal of
24  claims.
25      Now, in 2011, it's plain to see that

1  Cornerstone Bank was obviously the most active at
2  that time with a lot of other smaller creditors
3  having ones and two activities basically being
4  entries of appearance and the filing of claims.
5      But in 2012 -- no, 2011, I'm sorry,
6  this chart is to show that how -- who was active
7  in this case and what was going on.
8      And Cornerstone Bank, obviously, and
9  Bank of the Lake of the Ozarks were the two most
10  active. But you will note that CitiMortgage is
11  in our view is number three in the docket
12  activities with seven items.
13      Now, if the Court can flip the page to
14  2012, it gets a little bit more clean cut. You
15  will notice, Your Honor, that there aren't as
16  many creditors listed on this chart, number one;
17  and we have the change in the number one filer,
18  that in 2012 being Bank of Versailles -- I
19  shouldn't say filer, I'm sorry, entries, court
20  appearances, filings, anything of that nature.
21  We have bank of Versailles at 23, Nationstar at
22  nine and CitiMortgage, again in third, at six.
23      Now, to set the stage for 2012, I
24  believe this was the beginning matter where there
25  was some property disputes and discovery disputes

1 between Bank of Versailles; there was a -- also
2 the dispute began with Nationstar; and I believe
3 that is also when the adversary was filed.
4 　　　But nevertheless, the activity for 2012
5 greatly decreases in the number of creditors and
6 their actions.
7 　　　If the Court can flip the page to 2013,
8 you will notice that 2013 was not a very active
9 year in this case. The most active creditor was
10 Nationstar with seven, and then Farmers Bank
11 with one. And I believe that one may have been
12 an entry of appearance, but memory doesn't recall
13 on that.
14 　　　But nevertheless, 2013, there are only
15 two creditors with any actions during that year.
16 And so throughout this case, we have gone, as we
17 can see up to this point, we've gone from many
18 creditor actions to very few.
19 　　　Now, on the next year, 2014, we have a
20 little uptick of creditor activity, back up to
21 four creditors, still not a lot of activity, but
22 Bank of Versailles is obviously the most active
23 in 2014 with 17, Nationstar then comes in second,
24 Farmers Bank and Trust with third.
25 　　　Now, the reason why I go into those

1 years is to set the stage for the next two
2 upcoming years.
3 　　　As we can see from the Court, there was
4 a lot of activity up front as there always is
5 with proof of claims and entries of appearance
6 and then we start to dwindle as the case dwindles
7 as well.
8 　　　But if we can go to the year 2015, this
9 is when things really die down, in our view, and
10 this is where the two-party dispute actually
11 starts in our view.
12 　　　In 2015, we have CitiMortgage with 25
13 different actions; Bank of Versailles obviously
14 much smaller with four; Nationstar with two; and
15 we have Linda Beetle with one.
16 　　　Now, for 2015, what that one is with
17 Linda Beetle is actually a response to the
18 settlement objection that was filed. But that
19 case ultimately did get settled and resolved but
20 that one is just a response to an objection that
21 was filed.
22 　　　Nationstar, with two entries, is an
23 entry of appearance and then a change of address.
24 So while that was something, it's not really
25 significant or plays no matter in this case.

1 　　　Bank of Versailles with number four is
2 actually a limited response to a motion to
3 dismiss the Chapter 11 case.
4 　　　To refresh the Court's memory, the
5 Debtors filed a Chapter 11 -- motion to dismiss
6 their Chapter 11 case. That was ultimately
7 withdrawn -- before our large hearing on
8 October 29. Bank of Versailles filed a limited
9 objection stating that they did not care one way
10 or another if the case was dismissed or not as
11 long as the orders would stay in place,
12 mimicking what Mr. Wendt said today in his
13 limited objection.
14 　　　The other three are simply a few court
15 appearances by Mr. Wendt on behalf of the Bank of
16 Versailles.
17 　　　As you see for 2015, CitiMortgage is
18 the most active creditor and this is when the
19 dispute between the two parties really comes into
20 play with Linda Beetle filing really a response
21 that has no play between this two-party dispute
22 and of that settled; Nationstar filing
23 insignificant, and Bank of Versailles basically
24 showing up to the Court and saying we don't care
25 what happens.

1 　　　And finally we get to 2016, Your Honor.
2 In 2016, it may look like we have an uptick in
3 activity. But in reality, we don't, because many
4 of these that we're going to go through such as
5 Morgan County, Graves Bartle, Mark Murphy,
6 Farmers Bank, those are withdrawals that were
7 filed in the claims registry.
8 　　　Now, Morgan County, Graves Bartle and
9 Mark Murphy, those were withdrawals that were
10 filed one by the Debtor filing something saying
11 he doesn't owe anything, and then for two of them
12 the Court striking those proofs of claim. But
13 nevertheless, those are essentially, for the
14 purposes of today, those are withdrawals.
15 　　　Farmers Bank, same thing. Farmers Bank
16 withdrew their last claim number five, and that's
17 how we get to one creditor which is CitiMortgage
18 left, which is the initial chart that we showed
19 the Court.
20 　　　Linda Beetle has one action, which is
21 the finalization of their settlement before this
22 Court.
23 　　　So in 2015, we have their objection.
24 Now we have the settlement.
25 　　　Bank of Versailles again shows up with

1 three, and the reason being is the same for 2015,
2 they filed a limited objection to the motion to
3 dismiss the Chapter 7 case at this point, and
4 then a few court appearances notwithstanding
5 today.
6 Now, obviously, this chart, when I made
7 it, and it has a little legend at the bottom,
8 says up to August 31, 2016. So these charts
9 don't account for anything that happened in
10 September.
11 But nevertheless, Bank of Versailles,
12 even with three, had a limited objection saying
13 that they do not care one way or another what
14 happens in this case as long as the orders stay
15 in place, and then court appearances.
16 First Federal comes in second place at
17 number four. And all that is is one notice of
18 appearance of counsel and three withdrawals of
19 proof of claim.
20 So from First Federal all the way to
21 Morgan County, we essentially have a limited
22 objection, a settlement finalization, and mostly
23 withdrawals from all the others. CitiMortgage
24 number one is at 15.
25 Now, to go through what's happened

1 between CitiMortgage and the Debtor, throughout
2 this case, it is our contention that CitiMortgage
3 really has made this a two-party dispute from the
4 beginning, and I'll talk about why, Your Honor.
5 When the Debtors went into the Chapter
6 11 case, they filed a Chapter 11 plan.
7 MR. JOHNSON: Your Honor, I think we're
8 starting to stray a little bit from the scope of
9 the hearing as we're getting to CitiMortgage
10 where we're assuming that we're here --
11 THE COURT: Say that again.
12 MS. HAMILTON: I think we're getting a
13 little bit out of scope here if we're going to
14 start going into the CitiMortgage claims and the
15 question here is whether or not --
16 THE COURT: That's not what he -- I'm
17 going to overrule you at this point. He said
18 this is where CitiMortgage started to make it a
19 two-party dispute.
20 MR. HOORFAR: That's correct, Your
21 Honor.
22 THE COURT: He didn't -- he's not
23 challenging whether or not CitiMortgage has a
24 claim, at least thus far, and I don't think he's
25 ever going to. So let me see where he's going

1 with it.
2 MR. JOHNSON: Thank you, Your Honor.
3 MR. HOORFAR: That is correct, Your
4 Honor. We are not saying anything about
5 CitiMortgage's claims. We're just giving a quick
6 recap as to the events that occurred between
7 CitiMortgage and the Debtors.
8 The Debtors filed the Chapter 11 plan.
9 There was one objection to that plan and that was
10 filed by CitiMortgage.
11 The Debtors have filed a chapter -- a
12 motion to dismiss their Chapter 11 case.
13 THE COURT: This is also interspersing
14 argument to a certain extent which is fine, I'm
15 going to let that happen.
16 MR. JOHNSON: That's what I was going
17 to confirm, Your Honor, because this isn't really
18 evidence, it's argument.
19 THE COURT: But that's okay. Proceed.
20 MR. HOORFAR: Thank you, Your Honor.
21 And I'm happy to refer to the docket sheet if
22 need be, but --
23 THE COURT: That's fine. It's just
24 it's a little hard to present this without
25 presenting it in an argument form, too, so go

1 ahead. Proceed the way you want to proceed.
2 MR. HOORFAR: Thank Your, Honor.
3 So Debtors have also filed a motion to
4 dismiss their Chapter 11 case. That was in 2015.
5 There was one significant objection and that was
6 again by CitiMortgage.
7 Now, with that being said, Bank of
8 Versailles filed their limited objection, but,
9 again, all that that said mimicked what Mr. Wendt
10 said today which is Bank of Versailles does not
11 care what happens as long as the orders stay in
12 place. The Debtors have never said anything
13 about the orders not staying in place. So for
14 our purposes, the only significant objection to
15 that motion was CitiMortgage.
16 THE COURT: Have the Debtors ever said
17 anything that the orders will stay in place? I
18 think that's important with regard to this
19 particular society of Debtors.
20 MR. HOORFAR: Your Honor, I think --
21 this is going off recollection, I believe in a
22 previous hearing discussing the motion to
23 dismiss, we have stated that we would not
24 issue -- we would not address those orders. So
25 for the purposes of today, we'll go on record and

Heritage Reporting Service  www.heritagekcmo.com  Page: 10
Case 1:21-cv... Doc# 678-1 Filed 10/24/16 Page 10 of 44
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701

1  say we are not going to address or change or
2  re-litigate anything that's already happened.
3  THE COURT: For purposes of today. How
4  about for purposes a year from now?
5  MR. HOORFAR: Your Honor, in our view,
6  those are final orders. The appeal deadline has
7  ran on those. No appeal was filed. Those are
8  final orders.
9  THE COURT: And whichever it is, issue
10  preclusion or -- I'll go back to res judicata.
11  MR. HOORFAR: Yes, res judicata.
12  Either way, those are water under the bridge,
13  that ship has sailed. The appeal deadline has
14  ran. No appeal has been filed. So those
15  judgments are final and that was issued by this
16  Court.
17  THE COURT: Okay. And binding outside
18  this Court on any other court.
19  MR. HOORFAR: That's correct, Your
20  Honor. I don't know why it would not be binding
21  on any other court.
22  THE COURT: I know, but inquisitive
23  minds. I want a stipulation, I mean an absolute,
24  unequivocal, black and white stipulation that
25  they will not be challenged should I dismiss this

1  case.
2  MR. HOORFAR: Yes, Your Honor, that is
3  correct, those --
4  THE COURT: I'll probably want at some
5  point for that to be in writing by the Neighbors.
6  MR. HOORFAR: I will talk to them, Your
7  Honor, and we can do that.
8  THE COURT: And that's just -- okay.
9  MR. HOORFAR: Throughout the motion to
10  dismiss for the Chapter 11 case and for the
11  motion to dismiss this Chapter 7 case, at no
12  point have we said we'd like to undo those
13  orders.
14  THE COURT: I understand you haven't
15  said it.
16  MR. HOORFAR: I understand the
17  distinction, Your Honor. So we can put that in
18  writing if the Court would like it to clear
19  things up.
20  THE COURT: Well, it would keep
21  Mr. Wendt from coming back over here.
22  MR. HOORFAR: That's true, Your Honor.
23  I'm surprised he showed up today. He showed up
24  at the last hearing and told me he wouldn't. But
25  nevertheless, I'm glad he doesn't have to stick

1  around.
2  The Debtors have also filed motions to
3  employ two attorneys, one by the last name of
4  Merzack (phonetic), one by the last name of
5  Reynolds. Other than the Trustee's objection,
6  there was only one creditor that filed an
7  objection that was CitiMortgage.
8  As the Court can see, listed on the
9  Debtors' petition, there were 16 creditors. And
10  so far, the plan that they filed -- I'm sorry,
11  it's actually the amended -- well, I think there
12  was a plan and an amended plan, but nevertheless,
13  the plans that the Debtors filed, the motion to
14  dismiss their Chapter 11 case, and the motions to
15  employ were all objected to by one creditor, the
16  same creditor, CitiMortgage.
17  Then the Debtors filed a motion for the
18  Trustee to abandon some assets. We're not
19  discussing that motion today or the merits of
20  that. The only reason why I bring that up, Your
21  Honor, is because other than the Trustee's
22  objection, there was again one creditor that
23  filed an objection, and that was CitiMortgage.
24  Then we come to the motion that's
25  partially before the Court, Your Honor, which is

1  the Debtors' motion to dismiss their Chapter 7
2  case. And other than the Trustee's motion, there
3  was one significant objection to that. And
4  that's the same creditor, CitiMortgage.
5  Now, again, Bank of Versailles and
6  Mr. Wendt filed a limited objection, but, again,
7  keeping those orders in place, that's already
8  been discussed.
9  So in the purview of the five-plus
10  years that the Debtors have been in bankruptcy,
11  whether it be a Chapter 11 or a Chapter 7, the
12  motions that I set before the Court that I
13  mentioned were all objected to by one and only
14  one creditor, and it continues to be that way
15  today, Your Honor, by evidence of Debtors'
16  Exhibit 1 showing that with the withdrawal of
17  Farmers Bank, there's only one remaining creditor
18  left, CitiMortgage.
19  Now, Your Honor, that doesn't take into
20  account the fact that even if there was other
21  creditors -- which there are not -- but if there
22  were, whether or not they really care what
23  happens in this case.
24  The Debtors have filed two motions to
25  dismiss. Only CitiMortgage has responded or

1 objected to that. The Debtors have filed many
2 motions that I've mentioned, motions to employ,
3 motions to abandon assets, and those have only
4 been objected to by one creditor, again.
5      So even if there were creditors, Your
6 Honor, they have taken no action in regards to
7 the motions to dismiss. They have not even shown
8 up to Court in those hearings, and they are not
9 here today, Your Honor.
10      If there were creditors that --
11      THE COURT: Aren't you stretching
12 beyond the pretrial order here? Is there one
13 creditor, not whether there are other creditors
14 who don't care. The only issue is there's only
15 one creditor.
16      MR. HOORFAR: Your Honor, you are
17 correct, I can retract that statement. We are of
18 the -- it is our belief and it is our argument
19 that there is truly only one creditor,
20 CitiMortgage.
21      Now, you may hear arguments from
22 opposing side that there's this mysterious
23 Nationstar settlement that is out there, and that
24 the Debtors have secretly gone into an alleyway
25 and done this backdoor deal without anyone's

1 finding it or knowing it, now that it's come to
2 light that clearly Nationstar is a creditor
3 because they don't have access to that
4 settlement.
5      A couple of things that I'd like to
6 address about that argument, Your Honor, that I
7 heard from the other side. Number one -- let me
8 get to my notes here, Your Honor.
9      Well, while I'm finding my notes, Your
10 Honor, essentially what the argument says is that
11 simply because the settlement agreement between a
12 creditor and the Debtors is not given or provided
13 to a Trustee does not mean that they don't exist,
14 that simply means that the Trustee does not have
15 the settlement.
16      Now, let's talk about why the Trustee
17 does not have the settlement, because I'm
18 assuming that's going to -- that has been brought
19 up that we, the Debtors, have denied them or --
20 I'm sorry, not them, the Trustee, access to that.
21      And the reason being, Your Honor, is
22 because of the settlement agreement itself. It
23 has been communicated to the Trustee that the
24 settlement agreement states that it should not be
25 released to anyone without a court order.

1      Now, I will admit the Trustee has asked
2 my office several times for that agreement and
3 our answer is always the same. Simply handing
4 over the agreement would put the Debtors in
5 violation of that agreement.
6      THE COURT: Isn't the Trustee the
7 Debtor?
8      MR. HOORFAR: I believe the Trustee is
9 the Debtors' estate, Your Honor, but even though,
10 we don't want the estate to violate that
11 agreement.
12      THE COURT: Well, if they were giving
13 it to the Trustee -- I am having trouble
14 understanding how giving it to the Trustee would
15 be a violation, but we'll go on from there.
16      Is it stipulated that there's a
17 settlement that exists -- I mean, I think it's
18 agreed by everybody that there is a settlement
19 that exists, that that agreement has not been
20 provided to the Trustee, and the Neighbors
21 reasons for not providing it to the Trustee is it
22 can't be released without a court order and
23 there's no court order.
24      MR. HOORFAR: Yes, Your Honor.
25      THE COURT: Okay. Thank you.

1      MR. HOORFAR: Now, it's also been
2 brought up that the Debtors did not get Court
3 approval for that settlement and it's important
4 to note or go back to the date of when that
5 happened, without talking about the terms of the
6 settlement agreement being in violation of it, it
7 is -- it is within the docket sheet that that
8 case was mediated by Judge Karlin.
9      And it is also in the docket sheet that
10 that settlement agreement was discussed openly in
11 Court among the creditors, not the terms of the
12 agreement, but that an agreement did take place.
13 And, in fact, that settlement agreement was
14 signed in this very courtroom by the Debtors.
15      And while I'm looking for my case law,
16 Your Honor, and I'll get back to the Court on
17 that, there is a case that simply says that there
18 is no requirement outside of Rule 9019, which is
19 not a settlement under that rule, there is not a
20 requirement that that settlement be noticed up
21 for the Court and that it has court approval.
22      This case, which I will find later
23 on, Your Honor, goes on to say that if that
24 settlement is agreed to by the interested parties
25 of that agreement, and it is signed before the

1  Court, then that is good enough to have the
2  agreement move forward and will not be seen as an
3  undisclosed settlement or not giving notice to
4  anyone because it was done before the Court and
5  actually mediated by the judge.
6       THE COURT:  Didn't it fall apart about
7  three times?
8       MR. HOORFAR:  I'm sorry, Your Honor?
9       THE COURT:  I get these a little
10 blended, but didn't -- isn't that one of those
11 settlements that kept not sticking?
12      MR. HOORFAR:  That's correct, Your
13 Honor.  To give a little bit of background, there
14 was a settlement that was initially not finalized
15 but worked out by the Debtors' previous counsel
16 and that was -- that was mediated by the Debtors'
17 previous counsel and then that sort of fell to
18 the wayside, and that actually is now my office,
19 Your Honor, initially came into this case was to
20 try and finalize has which we did in early 2015.
21      So if memory serves me correct, and I
22 don't want to flip through the entire docket,
23 that there was an adversary case in 2012 that was
24 filed.  It did stay out for a very long time.
25 But after two plus years, we were able to

1  finalize that settlement and get that done in
2  2015.
3       So while opposing party may state that
4  this was some sort of backdoor deal that no one
5  knew about that somehow keeps Nationstar in the
6  matter, that adversary case was dismissed.  I
7  believe it was with prejudice.  But that
8  adversary case was dismissed.  There is a
9  settlement agreement.  The parties have settled
10 the matter.  And that settlement agreement was,
11 in fact, signed by the Debtors in this courtroom.
12      And with the limited scope, Your Honor,
13 of this pretrial order and the issues, that is
14 why the Debtors believe that only CitiMortgage
15 remains because if you review the claims
16 registry, there is only one still remaining,
17 counting the withdrawals as well as the orders
18 striking the proofs of claim as well as the
19 Nationstar settlement.
20      THE COURT:  Did Nationstar file a proof
21 of claim?
22      MR. HOORFAR:  They did, Your Honor.
23      THE COURT:  Has that proof of claim
24 been withdrawn?
25      MR. HOORFAR:  No, Your Honor.  That

1  claim still exists.  It is claim number 19.
2       THE COURT:  How do I make the leap from
3  they settled something to they have no claim?
4       MR. HOORFAR:  Well, Your Honor, because
5  the settlement agreement -- and I can't -- again,
6  the settlement agreement has settled all the
7  differences between the parties.
8       And the fact that Nationstar, since
9  that settlement, has done nothing in this case,
10 they have not filed since -- since that
11 settlement, they have not filed anything, they
12 have not attended any court.  That matter, in
13 Debtors' view and Nationstar's view, I believe,
14 they're not here to speak on behalf of
15 themselves, is closed.
16      THE COURT:  Okay.
17      MR. HOORFAR:  Which brings me to the
18 last matter, Your Honor, which is the ominous
19 statements that there are other creditors that
20 exist.
21      And simply we just point out that we
22 haven't seen them.  If there are creditors that
23 exist, where are they?
24      They certainly haven't come to court in
25 the last two years; they haven't filed anything

1  in the last two years, other than what our
2  Debtors' Exhibit 2 shows.  So it's one thing to
3  say that there are other creditors but we can't
4  say who they are or why, and it's another matter
5  to say here they are.
6       And I don't think that anyone other
7  than a court, Your Honor, I don't think that
8  myself nor opposing counsel or the Trustee can
9  speak on behalf of those creditors.
10      They are not here to state whether or
11 not they have a claim.  The Debtors have filed
12 many different motions saying that they do not
13 have a claim, that there are no creditors other
14 than CitiMorgage, there are no unsecured
15 creditors.
16      Mr. Neighbors testified over three
17 hours on October 29th saying that he believed
18 there were no unsecured creditors.
19      So there's everything in the record to
20 show that the Debtors believe that these
21 creditors don't exist.  And if they believed that
22 they did, it's our contention that they would
23 simply come forward, simply raise their hand and
24 say, Here we are, everything is incorrect, Your
25 Honor, we are here, we are creditors.  That

1 hasn't happened here.
2      What's happened here is that
3 CitiMortgage claims that they're a creditor --
4 and again, we're not disputing for this case --
5 but then they also go and say that there are
6 others, and they go to speak on behalf of those
7 creditors.
8      And it's our view that they simply
9 don't have the ability to do so. Those creditors
10 have counsel and they can speak for themselves.
11      I'm open to any questions, Your Honor,
12 or I'll hand it over.
13      THE COURT: Are there any of these
14 other Exhibits 1 through 28 -- well, first of
15 all, what is the status of these exhibits? Are
16 they all -- are there any objections to them? Do
17 you want they all admitted, 1 through 28? What's
18 the status?
19      MR. HOORFAR: Well, Your Honor, these
20 exhibits may lend towards the scope outside of
21 today on whether or not there's a two-party
22 dispute. I will use quite a bit of them for
23 rebuttal purposes. But, for example, Debtors'
24 Exhibit 3, 4 and 5 just simply shows the Court
25 that there are pending state court matters.

1      THE COURT: Okay. So you have referred
2 to Exhibit D-1 and D-2. Do you want them
3 admitted?
4      MR. HOORFAR: Yes, Your Honor.
5      MR. JOHNSON: Your Honor, we object to
6 the limited extent of lack of foundation. These
7 are summaries of docket entries. On the creditor
8 activity, I know Mr. Hoorfar walked through it,
9 but we've had no ability to verify if this is
10 correct.
11      So it's a demonstrative, and so we'd
12 object on the basis of foundation and it's a
13 summary.
14      And as to the chart with the number of
15 creditors, you know, if it's to show claims
16 withdrawn, I think the evidence will need to bear
17 out if this has foundation. If it's clearly just
18 people that have withdrawn claims, I think we
19 could verify that with the claims register, but I
20 think it goes further than that, at least with
21 Nationstar.
22      So I would object on lack of foundation
23 and we certainly don't stipulate to any of the
24 underlying facts that make up this certainly
25 because we haven't put on any evidence or we

1 haven't heard all the evidence with respect to
2 which creditors have withdrawn or not.
3      MR. HOORFAR: Your Honor, Debtors'
4 Exhibit 1, especially, is simply a recounting of
5 the claims registry. The claims registry is
6 Joint Stipulated exhibit. Debtors' Exhibit 1 is
7 easily verifiable and can be double checked by
8 anyone who would like. It's simply a re-counting
9 of the claims registry that is open and available
10 to anyone.
11      That was provided to the Debtors -- I'm
12 sorry, that was provided by the Debtors to
13 opposing counsel in a timely fashion; the same as
14 well for Debtors' Exhibit 2, it's not as easy to
15 go through the entire docket as the claims
16 registry, but in no way does the chart stray from
17 that, and that all that can be verified as well.
18      MR. JOHNSON: Your Honor, I would just
19 add that it's not just a simple look at the
20 withdrawal of the claims register because
21 Nationstar hasn't withdrawn its claim.
22      THE COURT: I'm going to admit it for
23 the very limited purpose that it shows what the
24 Debtor alleges is the situation but not that
25 it's -- I'm not going to find that it's accurate

1 without my checking it, subject to your checking
2 it, I'm not, but it -- it's what the Debtor
3 advances to be the situation, so it's admitted
4 for that purpose.
5      MR. HOORFAR: Thank you, Your Honor.
6 And if I could just quickly run through the
7 remaining exhibits just to be clear to the Court
8 as to what they are and to get them in, I've
9 already touched on them.
10      THE COURT: Well, I just -- if you want
11 them in at some point, we need to get them in;
12 and if you want to hold them for rebuttal or
13 other reasons, that's fine. I just -- I just
14 didn't want there to be a misunderstanding later
15 as to whether they were in or not.
16      MR. HOORFAR: Thank you, Your Honor.
17 If we can go very quickly through them. If we
18 can skip stick to Debtors' Exhibit 6, this is
19 simply a response filed by Bank of Versailles,
20 straight from the docket entries, I would move
21 that this be entered into as one of Bank of
22 Versailles limited objections.
23      THE COURT: Okay, actually, I will
24 admit any court document subject to it being made
25 relevant to what's before us at some point in the

Heritage Reporting Service    www.heritagekcmo.com
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 11-21003    Doc# 678-1    Filed 10/24/16    Page 14 of 44    Page: 14

1 future.

2     MR. HOORFAR: Thank you, Your Honor.

3     THE COURT: So that would be 6, 7, 8,

4 9, 10, 11, 12, 13.

5     MR. HOORFAR: Fourteen we do not need,

6 Your Honor.

7     THE COURT: Okay.

8     MR. HOORFAR: Fifteen and 16 we do not

9 need, Your Honor; 17, 18 is for rebuttal

10 purposes; 19 is by the Court, Your Honor; 20, 21

11 are filed with the Court, Your Honor.

12     THE COURT: It would be 28 in the court

13 docket.

14     MR. HOORFAR: Yes, that takes care of

15 most of the Debtors' exhibits other than rebuttal

16 exhibit or is outside the scope of today.

17     THE COURT: Okay.

18     MR. HOORFAR: Thank you.

19     THE COURT: Very good.

20     (Debtors' Exhibits 1, 2, 6, 7, 8, 9,

21     10, 11, 12, 13, 19, 20, 21, 28 received

22     in evidence.)

23     THE COURT: Why don't we take a short

24 break.

25     MR. JOHNSON: Just real quick on those

1 exhibits, just for the record purposes, on those

2 Court admitted documents, and I agree with the

3 Court on the relevance side of it, just for the

4 Court's clarification, we didn't oppose those

5 objections as part of the stipulated exhibits.

6     THE COURT: I understand.

7     MR. HOORFAR: Thank you.

8     MR. JOHNSON: Thank you.

9     THE COURT: Let's come back at 11:00

10 o'clock.

11     THE CLERK: Please, rise.

12     (Brief recess.)

13     MR. HOORFAR: The Neighbors have rested

14 so you go first, Mr. Johnson?

15     MR. JOHNSON: Yes, Your Honor. I think

16 at this point in time we're going to get straight

17 to the evidence. And with that, we call Mark

18 Neighbors to the stand.

19     (Witness sworn.)

20     THE CLERK: You may be seated.

21 Thereupon,

22     MARK NEIGHBORS,

23 was called as a witness and, having been duly

24 cautioned and sworn, was examined and testified

25 upon his oath as follows:

1     DIRECT EXAMINATION

2 BY MR. JOHNSON:

3 Q  Good morning, Mr. Neighbors.

4 A  Good morning, Mr. Johnson.

5 Q  We're going to get to the claims. If you could

6   grab the first book that has S1 through I think

7   S55. Now, if you could please turn to Exhibit 6

8   of that binder. And I'll represent to you that

9   this is the claim register as of September 21,

10   2016 that Mr. Hoorfar was speaking about in his

11   opening statements.

12     We are going to be jumping around the

13 exhibit books a little bit and referring back to

14 Exhibit 6. If Mr. Hoorfar doesn't have any

15 objection, if the Court doesn't have any

16 objection, I've made another copy of Exhibit 6 of

17 that register so it makes a little bit easier for

18 Mr. Neighbors.

19     MR. HOORFAR: We spoke about this

20 before the hearing, there's no problem with that.

21 It's a jointly stipulated exhibit.

22     THE COURT: Very good.

23 Q  (By Mr. Johnson) Hand that to you,

24   Mr. Neighbors.

25 A  Thank you.

1 Q  Now, do you understand that this register is --

2   understand this is a register of the parties have

3   filed proofs of claim in your case?

4 A  Yes.

5 Q  And if you could please go to page 8 of 12 of

6   that document.

7 A  Okay.

8 Q  And if you go down about midway through the page,

9   you will see a claim number 19 by Nationstar.

10 A  Yes.

11 Q  Do you see that? And do you understand that this

12   claim was originally filed by Bank of America and

13   then transferred to Nationstar Mortgage?

14 A  Yes.

15 Q  And that's your understanding, that Nationstar

16   became the subsequent creditor with regard to

17   that proof of claim?

18 A  I don't know how it all works. Nationstar was I

19   think who we were negotiating with, I think.

20 Q  So you understand that Nationstar is now the

21   claim-holders of claim number 19?

22 A  If that's what it says here.

23 Q  Do you have any reason to disagree with that?

24 A  It's -- it's a claim that they filled in and

25   they're supposed to provide accurate information.

Heritage Reporting Service    www.heritageekcmo.com      Page: 15
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 11-21003    Doc# 678-1    Filed 10/24/16    Page 15 of 44

1 Q   Okay.  Well, let's turn to Exhibit S22, and
2     that's in the book before you.
3 A   I have it.
4 Q   And I'll represent to you that this is claim
5     number 19, if you see on the bottom there it says
6     claim number 19?
7 A   Yes.
8 Q   And I will also refer you to the back three pages
9     of that exhibit.  Are you there?
10 A   Yes.
11 Q   Where it says doc number 220?
12 A   Yes.
13 Q   And it says "transfer of claim," do you see that
14     at the top of the document?
15 A   Yes, I see that.
16 Q   Do you see that the transferee is Nationstar
17     Mortgage?
18 A   Yes.
19 Q   Does that refresh your recollection that the
20     claim was transferred from Bank of America to
21     Nationstar?
22 A   Yes.
23 Q   Now, let's go back to the front of that claim,
24     and do you see that the claim asserted is in the
25     amount of $262,428.32?

1 A   Yes.
2 Q   Do you also see that it is asserted that the
3     claim is fully secured by the real property at
4     16963 Gentle Slopes Drive, Gravois Mills,
5     Missouri?
6 A   Yes.
7 Q   And is sometimes this street address also
8     referred to as tract E3?
9 A   Yes.
10 Q   So if I refer to it as tract E3, you will know
11     what I'm talking about?
12 A   Yes.
13 Q   Now, was tract E3 ultimately sold?
14 A   Yes.
15 Q   Was there a Realtor on the sale?
16 A   Yes.
17 Q   Who is that Realtor?
18 A   Our -- us.
19 Q   You and Ms. Neighbors?
20 A   Yes.
21 Q   So you are familiar with the sale?
22 A   Yes, we are.
23 Q   And what was the purchase price paid for tract
24     E3?
25 A   I believe it was $378,000.

1 Q   $378,000?
2 A   I believe so.
3 Q   And when was tract E3 ultimately sold?
4 A   2015.
5 Q   Does August of 2015 sound right?
6 A   Yes.
7 Q   How much did Nationstar receive from that sale?
8 A   If I answer that, would that --
9       THE COURT:  I'm going to order right
10     now that that settlement agreement be released
11     for the purposes of this Court and hearing.  And
12     if you want to seal this record later, if
13     somebody, we'll have a hearing on it.  But I do
14     not want that settlement agreement to stay out of
15     this process any longer.
16       THE WITNESS:  Thank you, Your Honor.
17       THE COURT:  You're welcome.
18       MR. HOORFAR:  If I may say something in
19     regards to that, we had spoken at break and we
20     have no problem offering that, just as the Court
21     suggested, as long as the Debtors' fears that
22     they have somehow violated that is quashed.
23       But I think the Court Order finalizes
24     that and that protects the Debtors from any
25     liability.  And with that, we have no problem,

1     Your Honor, providing that.  Unfortunately, I do
2     hot have that today.  But I can -- I can provide
3     that if it comes that we need that, Your Honor.
4       MR. JOHNSON:  Judge, I'm going to be
5     asking some basic terms and --
6       THE COURT:  Okay, we'll see where it
7     goes.
8       MR. JOHNSON:  All right, thank you,
9     Your Honor, and thank you for ordering the
10     submission of that.
11       MR. HOORFAR:  I'm sorry, just so we're
12     clear, Mr. Neighbors is, although he's testifying
13     to that, he is not going to be under any
14     liability from any party as long, as we're clear
15     for that?
16       THE COURT:  I'm ordering it be -- I'm
17     ordering to be -- what word should I use -- open,
18     released, it is -- it needs to be an exhibit or
19     referred to in this hearing, without -- so that's
20     my order and if it says the Court Order, I hereby
21     order it, whatever it, I order whatever is
22     required.
23       MR. HOORFAR:  Your Honor, if it makes
24     things easier, I would request a short recess,
25     even though we just had one.  I can contact my

1 office and have them fax the Court directly if --
2 otherwise Mr. Neighbors --
3   THE COURT: I think that would be
4 helpful.
5   MR. HOORFAR: I fear that Mr. Neighbors
6 would be testifying based on memory of something
7 that that happened over a year ago or more.
8   THE COURT: Why don't you contact them,
9 have them send it -- send it to the Court. I
10 don't know if we have -- have we got a fax number
11 somewhere?
12   THE CLERK: Yes, we do.
13   THE COURT: Get him the fax number.
14 And then -- I think we'll proceed with the
15 testimony awaiting its arrival, because he can
16 probably testify to some general things about it.
17   MR. HOORFAR: Thank you, Your Honor.
18 That would be helpful.
19   THE COURT: Five minutes.
20   (Brief recess.)
21   THE COURT: Okay. Thank you. Please
22 continue.
23   MR. JOHNSON: Thank you, Your Honor.
24 Q  (By Mr. Johnson) I guess to pick up where we
25 left off, Mr. Neighbors, I think what we have

1 last arrived at and maybe now with a cleaner
2 copy of the settlement statement, I'm going to
3 hand to you what's been premarked as Exhibit
4 C3, and I will represent to you that is the
5 settlement statement that your counsel just
6 provided us in connection with the sale of
7 tract E3. Are you familiar with that --
8   THE COURT: Let me interrupt here while
9 I'm thinking of it. Thank you for providing the
10 documents. And I think maybe you all probably
11 need to work up an order granting somebody's oral
12 motion to turn over a copy of the Nationstar
13 settlement agreement, and that way you can work
14 out the language that would make everybody
15 comfortable.
16   MR. HOORFAR: Thank you, Your Honor.
17 If it pleases everyone, I'm happy to draft one up
18 and circulate it.
19   THE COURT: Yes, whatever is convenient
20 for you.
21   MR. JOHNSON: Thank you, Your Honor.
22 Q  (By Mr. Johnson) So let's start back here just
23 so we can get kind of back into rhythm. Now,
24 with respect to tract E3, when was E3
25 ultimately sold?

1 A  August 27, 2015.
2 Q  All right. What was the purchase price paid for
3   tract E3?
4 A  $372,000.
5 Q  How much did Nationstar receive from that sale?
6 A  $193,391.21.
7 Q  And how much did you or one of your entities
8   receive from the sale?
9 A  $150,773.14.
10 Q  And did you receive any type of brokerage
11   commission or is that inclusive of that?
12 A  No, there was -- there was a commission paid and,
13   let's see, looks like $13,520.
14 Q  Now, with the excess monies that you received,
15   were those deposited into an account, a personal
16   account or into one of your entities' accounts?
17   MR. HOORFAR: Your Honor, if I can
18 object to that, I thought we were limiting this
19 to whether or not how many creditors were
20 present. Seems like we're diving into bank
21 statements what funds were used where.
22   MR. JOHNSON: Your Honor, so you know
23 where I'm going, this goes to what was done with
24 the money and was it used to pay creditors of
25 their estate outside a distribution process. I

1 think that goes to whether or not we have claims
2 by other creditors.
3   MR. HOORFAR: Your Honor, in response
4 to that, I don't think that it does. I think the
5 creditors can speak for themselves as to whether
6 or not they've received funds, no matter where
7 they came from. The fact that funds were
8 received and spent has nothing to do with who is
9 left.
10   THE COURT: Well, they're not going to
11 come in here and, I mean, if they got paid, they
12 got paid, they don't care.
13   MR. JOHNSON: Your Honor, if those
14 payments were somehow avoidable or could be --
15   THE COURT: I understand, that's -- it
16 may go to why they're not creditors. I'm going
17 to allow it a little bit but not too much,
18 Mr. Johnson, just a little bit and then we'll
19 revisit it.
20   MR. JOHNSON: Okay, Your Honor, and
21 I'll keep this narrow. I'm just trying to
22 understand the ultimate disposition here.
23 Q  (By Mr. Johnson) And did you pay creditors
24   with those monies?
25 A  Well, we paid whatever bills that we had to pay,

Heritage Reporting Service    www.heritageekcmo.com    Page: 17
Case 1:21-cv-21003   Doc# 678-1   Filed 10/24/16   Page 17 of 44
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701

1  a lot of legal fees that we had defending
2  ourselves against CitiMortgage.
3 Q  Did you pay any of your other prepetition
4  unsecured creditors with any of those funds?
5 A  Prepetition unsecured --
6 Q  Did you pay Farmers Bank with any of those funds?
7 A  Well, yes, we made monthly payments to Farmers
8  Bank. It's -- whether they were exactly from
9  those funds or funds that we put in from my
10  disability, I don't know exactly where -- one
11  thing we did do, Mr. Johnson, was we paid our
12  bills and we have CitiMortgage left.
13 Q  Well, and we're not here to talk about
14  CitiMortgage today, Mr. Neighbors. Did you pay
15  Garrett Graves any money from those settlement
16  funds?
17 A  I don't know if those were from those funds or
18  exactly where those funds --
19      THE COURT: Ask him where the -- was it
20  $173,000?
21      THE WITNESS: $150,773.
22      THE COURT: Ask him where that money
23  was deposited.
24 Q  (By Mr. Johnson) Mr. Neighbors, that 150,000
25  and change, was that deposited in your personal

1  accounts or was it deposited in another
2  entity's account?
3 A  I believe it was deposited in an LLC's account.
4 Q  And which LLC's account?
5 A  Mark and Shelly Neighbors, LLC. I don't have the
6  exact name. We provided all those records for
7  Ms. Hamilton.
8 Q  And out of those accounts, out of the LLC
9  account, did you pay Graves Garrett any of their
10  fees?
11 A  I don't recall where that payment came from.
12 Q  But you did pay them?
13 A  Yes.
14 Q  And when did you pay them?
15 A  In January I believe, January of 2016.
16 Q  And that was either out of your disability funds
17  or potentially these funds?
18 A  Or a real estate commission or --
19 Q  Did you commingle this $150,000 with your other
20  personal funds?
21 A  I don't believe so.
22 Q  So they're segregated and we could track the
23  distribution of those?
24 A  We provided all the records.
25      THE COURT: I believe -- let's move on,

1  Mr. Johnson.
2      MR. JOHNSON: Will do, Your Honor.
3 Q  (By Mr. Johnson) Now, with respect to
4  Nationstar, you were involved in some pretty
5  substantial litigation with them in this case;
6  is that correct?
7 A  Yes.
8 Q  And you ultimately did settle that litigation?
9 A  Yes, we did.
10 Q  And was a settlement agreement executed?
11 A  Yes, it was. Yes, sir, it was.
12 Q  And were you involved in that negotiation of that
13  settlement agreement?
14 A  Yes, we were.
15 Q  Okay. I am going to hand to you what has been
16  premarked as Exhibit C1 and C2.
17      THE COURT: Are you saying C as in cat?
18      MR. JOHNSON: C as in Citi, 1 and C2
19  and that's going to be a modification agreement.
20 Q  (By Mr. Johnson) Now, I've handed you what was
21  produced by your counsel pursuant to the
22  Court's order today, the document marked
23  Settlement Agreement and Release and Freddie
24  Mac Standard Modification Agreement. Do you
25  see that?

1 A  Yes. Yes. C2.
2 Q  Okay. And prior to today, had this agreement
3  been produced to the Trustee or any other party?
4 A  I don't believe so.
5 Q  Okay. Now, did your counsel instruct
6  Nationstar's counsel not to provide these
7  agreements to the Trustee?
8      MR. HOORFAR: Objection, Your Honor.
9  This is going communications between attorneys, I
10  don't what relevance that has.
11      THE COURT: We don't need to go down
12  that road today.
13 Q  (By Mr. Johnson) With respect to these
14  agreements with Nationstar, it was a kind of a
15  two-part agreement, so you had your settlement
16  agreement and then you had a loan modification
17  agreement; is that correct?
18 A  Yeah. There's two separate documents here, yes.
19 Q  So if I -- pardon my ignorance on this, I just
20  received it. If -- under the settlement
21  agreement, my read of this is that it didn't
22  release the underlying loan with Nationstar, this
23  settlement agreement did not release the
24  underlying loan, is that your understanding?
25 A  No, not at all.

1 Q So let me ask you then, if you turn to page 5 of
2   the settlement agreement --
3       THE COURT: When you say "no, not at
4   all," do you mean no, that not at all is that my
5   understanding?
6       THE WITNESS: Your Honor, I was under
7   the understanding that when we had our settlement
8   with Nationstar Bank of America, that we -- we
9   hashed it around and we were completely settled
10  with them.
11      THE COURT: Your answer could be
12  interpreted two ways. "No, not at all" could be
13  interpreted either a yes or a no answer. So I'm
14  just asking.
15      THE WITNESS: I believe we were in
16  complete agreement that Nationstar, Bank of
17  America were completely settled.
18      THE COURT: Okay.
19 Q (By Mr. Johnson) So when we say settled, did
20  you give them or did they give you a full
21  release under the settlement agreement?
22 A That was our belief, that there was a full
23  release, yes.
24 Q Okay. So if you could turn to page 5 of the
25  agreement, and actually I'll have you start on

1   the page before, page 4, Roman number two where
2   you see a release by Nationstar.
3 A Yes.
4 Q Now, the release starts there and it goes on to
5   the next page.
6 A I see that, yes.
7 Q And there is a sentence in the settlement
8   agreement that says: For avoidance of any doubt,
9   Plaintiffs agree they are still liable under the
10  loan as modified by the modification agreement.
11  Plaintiffs further agree and acknowledge
12  Nationstar retains all rights under the note and
13  deed of trust as modified by the modification
14  agreement and may take any and all actions
15  permitted under the law as modified by the
16  modification agreement and the applicable law to
17  enforce Plaintiffs' obligation under the note and
18  deed of trust as modified by the modification
19  agreement.
20      Do you see that?
21 A Yes.
22 Q So that's not a complete releases?
23 A Well, it was our understanding that it was a
24  complete release. We sold the property, so isn't
25  this kind of a --

1 Q Well, it was -- did you have counsel representing
2   you in this agreement?
3 A Yes, we did.
4 Q And did -- well, I don't want to get into your
5   attorney-client communications. So you believed
6   by executing this agreement and the modification
7   agreement that all your claims were released by
8   Nationstar, or was there another step?
9 A We still had a loan with whomever, we knew that.
10 Q So they still had a claim against you at the time
11  you signed the settlement agreement?
12 A Yes.
13 Q And --
14 A And since then, we sold the property and paid
15  them.
16 Q Okay. Now, do you -- well, let's back up. Do
17  you still believe you have any claims against
18  Nationstar?
19 A No.
20 Q So you are in agreement those are completely
21  released?
22 A Yes.
23 Q And when you signed this agreement with
24  Nationstar, was it your intent to also release
25  the claims of your bankruptcy estate?

1 A We were in bankruptcy court with attorneys that
2   get paid a lot per hour, and we assumed that
3   Nationstar brought people together and Erlene
4   Krigel was involved in it.
5 Q Well, your counsel here was also involved in it,
6   was he not?
7 A Yes, at the very end.
8 Q When it was -- when you were here in court --
9 A That's correct.
10 Q -- right?
11 A That's correct.
12 Q So let me ask my question again. Did you intend
13  to release the claims against Nationstar on
14  behalf of your bankruptcy estate?
15 A Ask that question again.
16 Q Did you intend to release the claims against
17  Nationstar on behalf of your bankruptcy estate?
18      MR. HOORFAR: Your Honor, I think it
19  may be clearer to differentiate between the first
20  question and the current question. The question
21  was previously asked: Mr. Neighbors, did you --
22  paraphrasing here -- Mr. Neighbors, did you
23  release your claim from Nationstar and do you
24  have any other claims against them? His answer
25  was: No, we do not have anymore claims.

1       I don't think, myself included, that
2  the difference is clear between Mr. Neighbors and
3  then the current question which is Mr. Neighbors'
4  bankruptcy estate. So if we could get some
5  clarification on that, I think we might be able
6  to get an answer from Mr. Neighbors.
7       MR. JOHNSON: Let me try it this way,
8  Your Honor.
9  Q  (By Mr. Johnson) When you signed this
10  settlement agreement, you were still in Chapter
11  11 bankruptcy; isn't that correct?
12  A  That's correct.
13  Q  And you were both a debtor and a debtor in
14  possession; isn't that correct?
15  A  Yes.
16  Q  So when you signed this agreement releasing
17  claims against Nationstar, was it your intent to
18  release claims on behalf of the bankruptcy estate
19  in addition to any other claims you may have?
20  A  I'm not sure I completely understand where you're
21  going with this.
22  Q  After you signed the agreement, did you believe
23  that either your bankruptcy estate or yourself
24  could bring any claims against Nationstar?
25  A  No, we settled with them.

1  Q  Now, did you seek court approval of this
2  settlement? Did you file a motion?
3  A  You are asking me if I filed a motion?
4  Q  Did you authorize your counsel to file a motion?
5       THE COURT: How about some court
6  approval of this settlement sought?
7       MR. JOHNSON: Thank you, Your Honor.
8  Q  (By Mr. Johnson) Was court approval of this
9  settlement sought?
10      MR. HOORFAR: Could we change that to
11  formal? I think the difference is we
12  differentiate on -- was a motion and notice of
13  hearing filed? I think that may be the question.
14      THE COURT: Let's go with the first
15  question, and then that is a good follow-up
16  question.
17  Q  (By Mr. Johnson) Did you seek formal court
18  approval of this settlement?
19  A  I thought when we were in court and we had a
20  settlement, that the approval process was taking
21  place. We signed those, the settlement agreement
22  documents in this room. And a lay person is
23  going to believe that they had a legitimate
24  settlement.
25  Q  Let me ask you this: You weren't here by

1  yourself, though, were you; you had counsel?
2  A  We did.
3  Q  You had bankruptcy counsel?
4  A  And so did Nationstar.
5  Q  So you signed, and I believe this was in the
6  context of an adversary proceeding, a complaint
7  you had filed against Nationstar?
8  A  Yes.
9  Q  And you came here to court and you signed the
10  documents?
11  A  If that's -- that's correct.
12  Q  Did you inform the Court what the terms were of
13  the settlement?
14  A  I don't know the answer to that. I thought that
15  the documents were circulated and that there was
16  some discussion, Judge Somers was helpful in that
17  and we were trying to get to the -- to a
18  settlement, and I don't know.
19  Q  So when you say the documents were circulated,
20  who were they circulated to?
21  A  I believe it was everybody that was in this
22  courtroom.
23  Q  So the parties to the adversary proceeding?
24  A  Yes, and Judge Somers had a copy of it.
25  Q  So it's your testimony that you provided a copy

1  to the Court?
2  A  I'm not sure, Mr. Johnson.
3  Q  Okay, fair enough.
4  A  I think that's what happened, but I'm not
5  certain.
6  Q  Now, is it your position here today that
7  Nationstar has released all claims against you
8  and your spouse, Ms. Neighbors?
9  A  Yes.
10  Q  Okay. And you understand that they still have a
11  proof of claim on file?
12  A  They haven't removed the proof of claim but the
13  property's been sold and they've been paid off.
14  Q  Well, let's talk about that. Have you or someone
15  on your behalf formally objected to that claim?
16  A  We didn't believe it was necessary.
17  Q  Why did you not believe it was --
18      THE COURT: Would you answer yes and no
19  to these questions that are yes and no questions?
20      THE WITNESS: Okay, ask the question
21  again. I'm sorry, Your Honor.
22  Q  (By Mr. Johnson) Have you or someone on your
23  behalf formally objected to the Nationstar
24  claim?
25  A  No.

Heritage Reporting Service   www.heritagekcmo.com   Page: 20
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 11-21003   Doc# 678-1   Filed 10/24/16   Page 20 of 44

1 Q   Okay.  And why not?
2 A   We didn't believe it was necessary, or I didn't
3     believe it was necessary.
4 Q   And why didn't you believe it was necessary?
5 A   It was paid off.  So there is no -- there is no
6     claim, I mean.
7 Q   Well, did you ask them to withdraw their proof of
8     claim?
9 A   You just asked -- you just asked me that
10    question, I said no.
11 Q   I asked you if you'd objected to their proof of
12    claim.
13 A   You asked me if I -- no.
14 Q   You have not reached out to Nationstar to ask
15    them to withdraw their claim?
16 A   No.
17 Q   And why haven't you made that request?
18 A   Because the property has been sold and we didn't
19    believe that it was necessary.
20 Q   Now, you've asked other creditors to withdraw
21    claims on settlements, have you not?
22 A   On settlements?
23 Q   Or on any claims?
24 A   Why don't you be specific?
25 Q   Have you objected to other claims in this case?

1 A   Yes.
2 Q   Did you object to the Private Bank claim?
3 A   I'm not sure if it was an objection.  Maybe
4     that's what you have to file to have it
5     officially removed.  You put in your motion to
6     convert us that Private Bank was still out there.
7     You listed them as a creditor and we knew that
8     they were not a creditor.  And so maybe that's
9     officially how you get that message across to you
10    that Private Bank was not a creditor, that they'd
11    been settled.
12 Q   Isn't that the same resolution with Nationstar?
13 A   You know, asking me a lot of stuff --
14      THE COURT:  If you don't know the
15    answer --
16      THE WITNESS:  I don't know the answer.
17      THE COURT:  -- just simply say "I don't
18    know the answer."
19 A   I don't know.  I don't.
20 Q   (By Mr. Johnson)  Now, on the settlement
21    agreement -- well, you testified that you sold
22    the property, that tract E3, correct?
23 A   Yes.
24 Q   And is it your position that tract E3 is owned by
25    your LLC?

1 A   It was owned by our LLC.
2 Q   Prior to the sale?
3 A   Yes.
4 Q   Okay.  And at the time you entered into the sale
5     agreement, was it owned by your LLC?
6 A   Yes.
7 Q   And that's your position?
8 A   Yes.
9 Q   So if you could take a look at Exhibit C1, are
10    you with me?
11 A   Yes.
12 Q   And that first whereas clause states:  Plaintiffs
13    own real property located at 16963 Gentle Slopes
14    Drive, Gravois Mills, Missouri.
15 A   Yes.
16 Q   Do you see that?
17 A   Yes.
18 Q   Based on your testimony just now, do you agree
19    with me that that clause is not true and correct?
20 A   Ask me that again.
21 Q   Would you agree with me that the first whereas
22    clause which states:  Plaintiffs own real
23    property located at 16963 Gentle Slopes Drive,
24    Gravois Mills, Missouri, the property, would you
25    agree with me that that statement is not true and

1     correct?
2       THE COURT:  Go up to the --
3 A   I don't like the way --
4       THE COURT:  The very first paragraph,
5     the preamble, I'll call it, where Plaintiffs is
6     defined, and go there and then come down to this
7     paragraph.
8       MR. JOHNSON:  I'll give a little bit
9     more foundation, Your Honor.
10 Q   (By Mr. Johnson)  So under this agreement, do
11    you see the first paragraph?
12 A   Yes, I do.
13 Q   And Plaintiffs Mark S. Neighbors and Shelly K.
14    Neighbors are defined as the Plaintiffs.  Do you
15    see that?
16 A   Yes, I do.
17 Q   And is your LLC a party to this agreement?
18 A   We certainly believe that it is.
19 Q   Where are they listed as a party?  If you look in
20    the first paragraph it lists the party?
21 A   Yes, it lists Mark S. Neighbors and Shelly K.
22    Neighbors are the Plaintiffs.
23 Q   So let's move back down to the first whereas
24    clause where it says:  Whereas, Plaintiffs own
25    real property located at 16963 Gentle Slopes

1    Drive, Gravois Mills, Missouri, in parens, the
2    property, that's tract E3 you're referring to
3    there, correct?
4 A  Yes.
5 Q  And the Plaintiffs refer to you and
6    Ms. Neighbors; is that correct?
7 A  That's what this document says, yes.
8 Q  And did you own the real property on March 13th,
9    2015, tract E3?
10 A  Our LLC was the owner of the property.
11 Q  So this statement is not correct?
12 A  I would suppose it may not be completely
13    accurate.
14 Q  Now, the other part of your settlement agreement
15    is the modification agreement; is that correct?
16 A  Yes.
17 Q  And the primary driver of the modification
18    agreement was, if I understand this, it reduced
19    the note balance to $200,000?
20 A  Yes.
21 Q  Had this modification agreement not been entered
22    into, the note balance would have been higher
23    than $200,000?
24 A  Had the modification -- well, not without the
25    settlement agreement.

1 Q  Would it have been that original $262,000 we
2    spoke about earlier this morning?
3 A  It would have been closer to the 262. I don't
4    know the exact number, but --
5 Q  So as part of the modification agreement, you got
6    a principal reduction on the loan?
7 A  As part of the settlement agreement, that's what
8    we got.
9 Q  And this modification agreement is a key aspect
10    of the settlement agreement?
11 A  Yes.
12 Q  These documents are dated in March of 2015, both
13    the settlement agreement and the modification
14    agreement, correct?
15 A  Did you say the date, is that what you are
16    asking, what's the date of them?
17 Q  What's the date of these agreements?
18 A  3-26-15. Yeah, 3-26-15.
19 Q  So they are both entered into March of 2015?
20 A  Yes.
21 Q  And when was the property sold again, it was in
22    August 2015, correct?
23 A  Yes.
24 Q  Did you enter into any other agreements with
25    Nationstar between March of 2015 and August of

1    2015 that has not been produced here today?
2 A  In their closing, there would have been some type
3    of an agreement.
4 Q  Okay. Has that been produced today or do you
5    have that to produce?
6 A  I'm not sure that we even have some of their
7    internal agreements. I don't know what you're
8    looking for.
9 Q  Well, did you have -- did you or Ms. Neighbors or
10    any of your entities have any further agreements,
11    I'm not talking about internal Nationstar
12    agreements, but did you have any further written
13    agreements with Nationstar after these two
14    primary agreements?
15 A  I don't believe we did.
16 Q  Are you aware of any facts or has Nationstar
17    asserted to you or your counsel that they still
18    maintain a claim against you or Ms. Neighbors?
19 A  Ask me that again.
20 Q  Has Nationstar to you or Ms. Neighbors, to your
21    knowledge, have they asserted any claims against
22    you currently?
23 A  No.
24 Q  Have you had any discussions with Nationstar
25    since the close of the real estate?

1 A  No.
2 Q  Has your counsel had any conversations with
3    Nationstar?
4      MR. HOORFAR: Objection, Your Honor,
5    that's something that he's not going to be able
6    to know because he's questioning about my
7    communications and that's always going to be
8    protected under attorney-client privilege.
9 Q  (By Mr. Johnson) I believe the question is did
10    your counsel have any conversations with
11    Nationstar that you are aware of after the
12    closing?
13 A  Not that I'm aware of. You're talking about the
14    closing in August of 2015?
15 Q  Yeah, after August of 2015, you've had no
16    conversation, communication, letters with
17    Nationstar?
18 A  No.
19 Q  Absolutely silent?
20 A  I haven't heard a word from them.
21 Q  Has your counsel?
22      THE COURT: He's already answered that
23    question.
24      MR. JOHNSON: Your Honor, at this time
25    I'd ask that Exhibits C1, C2 and C3 be entered

Heritage Reporting Service    www.heritagekcmo.com    Page: 22
Case 1:21-cv-01083    Doc# 678-1    Filed 10/24/16    Page 22 of 44
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701

1 into the record subject to a further court order
2 as to their confidentiality.
3     MR. HOORFAR: Subject to that
4 stipulation, Your Honor, we have no problem with
5 that.
6     THE COURT: Thank you. They will be
7 admitted.
8     (CitiMortgage Exhibits C1, C2 and C3
9     received in evidence.)
10 Q (By Mr. Johnson) All right. Let's move on
11   from Nationstar. If you could turn back to
12   that claims registry.
13 A I have it.
14 Q You could look on that first page, you will see
15   claims reflected, two through four filed by
16   Cornerstone Bank?
17 A Yes, I see them.
18 Q And it your understanding that Cornerstone Bank
19   originally had filed four claims against you or
20   against your bankruptcy estate?
21 A There's, as a combination of Neighbors
22   Investments or personally, I believe there's only
23   two.
24 Q Let's go down the claims register so we're on the
25   same page. So if you look at claim number two,

1   that shows a claim filed by Cornerstone, would
2   you agree with me?
3 A Yes. Yes.
4 Q So let's look at claim number three, that shows
5   another claim by Cornerstone bank, correct?
6 A That's correct.
7 Q Okay. You go -- you are correct, there's three
8   claims. If you go to claim number four, would
9   you agree with me that's a claim by Cornerstone?
10 A Yes.
11 Q So I correct myself, there was three claims filed
12   by Cornerstone.
13     Now, if you could turn to Exhibit 9, in
14   that big book in front of you.
15 A Okay, I'm here.
16 Q You see that Cornerstone bank withdrew claims
17   two, three and four?
18 A I see that, yes.
19 Q Were these claims withdrawn on account of the
20   settlement agreement with Cornerstone?
21 A I suppose. They filed it with you-all.
22 Q Have you entered into a settlement agreement with
23   Cornerstone?
24 A Yes, we did.
25 Q Okay. And would these claims have been withdrawn

1   on account of that settlement agreement?
2 A If there was -- yes, yes.
3 Q Now, in your settlement agreement with
4   Cornerstone, did that agreement provide a
5   complete release of claims? And let me be more
6   specific, I'm sorry. Did that settlement
7   agreement provide for a complete release of
8   Cornerstone claims against you and Ms. Neighbors?
9 A We believe so.
10 Q Okay. And did you provide Cornerstone a complete
11   release of claims?
12 A I'm not certain.
13 Q Why do you say you are not certain?
14 A Because I'm not certain.
15 Q So do you believe that you still maintain claims
16   against Cornerstone?
17 A You asked me if we entered into a settlement
18   agreement.
19     THE COURT: It's a yes or no question.
20     THE WITNESS: I don't know the answer
21 to that.
22     THE COURT: Well, yes, you do, you know
23 whether you still think that you have a claim
24 against Cornerstone.
25     THE WITNESS: Oh, is that what he

1 asked?
2     THE COURT: I think that's -- yes,
3 that's what he's asking. Do you think you still
4 have any claim against Cornerstone?
5     THE WITNESS: I believe there's a
6 possibility.
7     THE COURT: Okay.
8 Q (By Mr. Johnson) Why do you believe there's a
9   possibility that you may have claims against
10   Cornerstone?
11 A You know, you're asking me some legal questions
12   and there's -- I'm not an attorney, I don't know
13   if there's -- if we have any kind of claim
14   against Cornerstone or not, I'm not an attorney.
15 Q Why do you believe -- I'm not asking you for the
16   legal analysis. I'm asking why do you have this
17   belief that you may have claims against
18   Cornerstone?
19     MR. HOORFAR: Your Honor, I'm going to
20 have to object to this, too. If there's a
21 settlement agreement out there that Mr. Neighbors
22 signed that can be produced so he can read it,
23 then we'll all be aware of what he waived and
24 what he didn't, Mr. Neighbors is already --
25     THE COURT: I'm going to overrule it

Heritage Reporting Service    www.heritagekcmo.com    Page: 23
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 11-21003   Doc# 678-1   Filed 10/14/16   Page 23 of 44

1 because that's been the history in this case.
2 These things coming back to life after it appears
3 that they have ended and then they come back,
4 and -- and that's why Mr. Wendt keeps showing up
5 at these hearings. And if, you know, if he
6 thinks that he has some claim against
7 Cornerstone, just what is it and then we'll move
8 on because we're not going to spend any time in
9 determining whether it's valid or whether it's
10 not valid or whether it's legal or whether it's
11 not legal or whether it's cause he's just mad at
12 them or --
13     THE WITNESS: Thank you, Your Honor.
14     THE COURT: If he thinks he's got a
15 claim, just say what you think it could possibly
16 be, but -- and then we'll move on.
17 A   Thank you. I'd like to answer this as
18 expeditiously as possible, Mr. Johnson. They
19 withdrew their claims. So we don't believe they
20 had -- that they have any claims against us.
21 They withdrew their claims. And, yeah, are we
22 mad at them? Yeah, we're mad at them. Do we
23 have a claim, I don't know.
24     THE COURT: Okay, we'll accept that.
25 Q   (By Mr. Johnson) Now, at your 341 --

1     THE COURT: Which 341?
2 Q   (By Mr. Johnson) At the July 26, 2016, meeting
3 of creditors --
4 A   Is that the first, second or third?
5 Q   That's a good question. On the July 26, the
6 meeting of creditors --
7     THE COURT: What year?
8 Q   (By Mr. Johnson) 2016, the last meeting of
9 creditors that you attended, you testified you
10 believed that the settlement agreement with
11 Cornerstone was signed under duress?
12 A   We do. We do believe that was signed under
13 duress.
14 Q   Is that one of the reasons why you believe that
15 you may still have claims against them?
16 A   Yes.
17 Q   Thank you. Now, let's turn back to Exhibit 6,
18 which is a claims register. If you want to just
19 do the next one, Mr. Neighbors, I can see you
20 flipping.
21 A   Okay.
22 Q   Now, if you could turn to page 8 of 12.
23 A   I have it.
24 Q   Okay. Now, do you see at the very bottom of the
25 page, claim number 20, Central Bank of the Lake

1 of the Ozarks?
2 A   Yes.
3 Q   And then if you turn the next page, do you see
4 claim number 21?
5 A   Yes.
6 Q   Central Bank of the Ozarks?
7 A   Yes.
8 Q   And then if you go to claim number 22, Central
9 Bank of Lake of the Ozarks; do you see that?
10 A   Yes. And there's one more.
11 Q   Did I miss one?
12 A   Twenty-three, Central Bank, Lake of the Ozarks.
13 Q   Appreciate that. So if you move on to page 10 on
14 claim number 23, you see Central Bank of the Lake
15 of the Ozarks, so they had four claims in your
16 bankruptcy case?
17 A   Yes.
18 Q   Now, if you turn -- please turn to Exhibit 23.
19 A   Okay.
20 Q   Now, Exhibit 23, is it correct that Central Bank
21 withdrew those four claims?
22 A   Yes.
23 Q   And were these claims withdrawn on account of a
24 settlement agreement with Central Bank?
25 A   There was a trustee's sale.

1 Q   Okay. So they sold the real property? I guess I
2 don't understand when you say there was a
3 trustee's sale. Did you have an agreement with
4 Central Bank?
5 A   Substitute trustee sale --
6     THE COURT: Was it a foreclosure
7 trustee's sale or a bankruptcy trustee sale?
8     THE WITNESS: Foreclosure.
9     THE COURT: Under Missouri law, that's
10 the way that --
11     THE WITNESS: It's called a
12 substitute --
13     THE COURT: Deed of trust.
14     THE WITNESS: -- trustee's sale.
15 Q   (By Mr. Johnson) So these claims dealt with
16 four pieces of real property?
17 A   There was four loans --
18 Q   Okay.
19 A   -- that apprised these four claims.
20 Q   And were they secured by multiple pieces of
21 property or just one?
22 A   Two pieces of property, two separate pieces of
23 property.
24 Q   And those properties were foreclosed upon by --
25 or there was a trustee's sale under state law of

Heritage Reporting Service    www.heritagekcmo.com    Page: 24
Case 1:21-cv-21003  Doc# 678-1  Filed 10/24/16  Page 24 of 44
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701

1 those properties?
2 A Yes.
3 Q Okay. And was Central Bank the successful
4 purchaser at that sale of these properties?
5 A No.
6 Q Who was the successful purchaser if you know?
7 A David Baumgarner, Ospry Lane, LLC.
8 Q And did he pay the full amount of the notes as
9 part of this sale?
10 A It's our understanding that he did, yes. He bid
11 that amount if that's what you mean.
12 Q So he bid the full loan amount?
13 A Yes. He bid 300 -- approximately $390,000 over
14 the advertised amount.
15 Q When you say the advertised amount, what is the
16 advertised amount?
17 A When you post it in the paper for the amount of
18 the secured claim.
19 Q Okay. So he paid more than what the secured
20 claim was on it?
21 A Yes.
22 Q So to just kind of -- so there was no settlement
23 agreement with Central Bank?
24 A No. No.
25 Q And now do you believe that you have claims

1 against Cornerstone?
2 A Cornerstone?
3     THE COURT: Are you sure you mean
4 Cornerstone?
5 Q (By Mr. Johnson) Oh, I'm sorry, do you believe
6 that you have claims against Central Bank?
7 A Yes.
8 Q And with respect to -- okay. So before I move
9 on, circling back, one question I forgot to ask
10 you and that's why Cornerstone was on my mind,
11 the settlement agreement that you had with
12 Cornerstone, did you seek court approval of that
13 agreement?
14 A Did I seek court approval?
15 Q Did you or your attorney seek approval for that
16 agreement?
17 A I don't know the answer to that, but I do believe
18 that there is some documents that were filed with
19 this court.
20 Q Dealing with the Cornerstone settlement?
21 A Yes.
22 Q But you are -- and you don't have any other
23 knowledge otherwise or don't recall?
24 A I don't recall.
25 Q Okay. All right. Let's turn back to Exhibit 6,

1 the claims register, and if you could go to page
2 2 of 12.
3 A Okay.
4 Q Do you see claim number five filed by Farmers
5 Bank and Trust?
6 A Yes, I do.
7 Q That's in the amount of $184,600.85?
8 A Yes.
9 Q Now, with respect to this particular loan, if you
10 look at the description, it says: Personal
11 guarantee for money loaned. Do you see that? At
12 the very bottom of the page.
13 A Yes.
14 Q And is it your recollection that this claim to --
15 or this debt owed to Farmers was on account of a
16 personal guarantee.
17 A I didn't believe it was. This was a Neighbors
18 Investment loan.
19 Q So Neighbors Investments was the primary obligor?
20 A That's correct.
21 Q And you don't believe you guaranteed this loan?
22 A No, I don't.
23 Q You didn't sign a guaranty; didn't execute
24 anything to that effect?
25 A I don't believe there's a personal guarantee on

1 this.
2 Q Let's talk about this particular loan. Neighbors
3 Investments was the primary obligor as you
4 testified. Was this dealt with in Neighbors
5 Investments' plan --
6 A Yes.
7 Q -- of reorganization?
8 A It was.
9 Q And are you still paying on this obligation to
10 Farmers through Neighbors Investments?
11 A Yes.
12 Q And what is the approximate payoff of this loan
13 as we stand here today, if you know?
14 A I am going to guess it's in the 150-, $160,000
15 range.
16 Q Now, if you turn to Exhibit 10 -- and Farmers
17 withdrew -- these are the Farmers withdrawal of
18 claims; do you see that?
19 A Uh-huh.
20 Q If you go to the last page where it says
21 withdrawal of proof of claim number five?
22 A Yes.
23 Q This claim was just recently withdrawn; isn't
24 that correct?
25 A Yes.

1  Q  Now, did you or anyone on your behalf ask Farmers
2     to withdraw this claim?
3  A  We questioned the legitimacy of the proof of
4     claim.
5  Q  Was that done in written correspondence to them?
6  A  No.
7  Q  Okay.  So in reaching out to Farmers, you
8     questioned the legitimacy of their claim.  What
9     reasons did you give to Farmers on why they
10    should withdraw the claim?
11        MR. HOORFAR:  Your Honor, I object to
12    this.  Again, this is going into outside the
13    scope of this.  It's clear that the proof of
14    claim has been withdrawn.  It's clear that it was
15    filed.  Mr. Neighbors has stated whether or not
16    he believes there's a personal guarantee.  I
17    don't see the reasoning why behind with
18    withdrawal makes any difference for the scope of
19    today as to whether or not CitiMortgage is the
20    only creditor.
21        MR. JOHNSON:  Your Honor, I just have a
22    few follow-up that might bring them --
23        THE COURT:  So let me hear them before
24    I rule.
25 Q  (By Mr. Johnson)  So back to the question

1     before the objection, pending the ruling, what
2     reasons did you provide to Farmers or was given
3     to Farmers as to why they should withdraw their
4     claim?
5        THE COURT:  If you know.
6  Q  (By Mr. Johnson)  If you know.
7  A  Because we didn't believe we had a personal
8     guarantee and they were not able to provide
9     documentation to prove it.
10 Q  Now, apart from this claim, did you or anyone on
11    your behalf make any settlements with Farmers
12    regarding the withdrawal of the claim?
13 A  Ask me that again.
14 Q  Did you or anyone on your behalf have any
15    agreements or settlements with Farmers regarding
16    the withdrawal of this claim?
17 A  No.
18 Q  So the withdrawal, you called them up -- just so
19    I understand it, you called them up, you
20    questioned the legitimacy of the claim and they
21    withdrew?
22 A  Just like there are other claims that they had
23    filed, this was one that had he had just
24    forgotten to do, you know.  They also withdrew
25    three other claims that they had filed against

1     us, but there were no loans there.
2  Q  Okay.
3  A  So there's a pattern of incorrect claims with
4     them.
5  Q  Do you believe you have any claims against
6     Farmers at this time?
7  A  No.
8  Q  And was there any agreement that if they withdrew
9     their claims, you wouldn't assert any claim
10    against them?
11 A  No.
12 Q  All right.  Let's go back to Exhibit 6, if you
13    could go to page 4 of 12.
14        MR. HOORFAR:  Your Honor, are we done
15    with questioning and is the objection --
16        THE COURT:  I'm going to allow the
17    question.  I don't see how it harms anything one
18    way or the other.
19 Q  (By Mr. Johnson)  If you turn to Exhibit 6, you
20    see claim number eight, you see that's from the
21    Private Bank?
22 A  Yes.
23 Q  Okay.  And if you turn to Exhibit 12 --
24 A  Yes.
25 Q  -- I need you to go to the exhibit book, I'm

1     sorry, in the exhibit book, claim 12 -- or
2     Exhibit 12, I'm sorry?
3  A  Okay.
4  Q  So I'm going to represent to you that this is a
5     claim objection filed by your counsel against the
6     Private Bank; do you see that?
7  A  Yes.
8  Q  Did you authorize your counsel to file this
9     objection?
10 A  Yes.
11 Q  Okay.  And then if you see in paragraph one, it
12    states that the Private Bank and Trust Company
13    filed a proof of claim on May 24th, 2011, claim
14    81?
15 A  Yes.
16 Q  And then in paragraphs two and three -- and I'm
17    paraphrasing -- it states that the Debtor and the
18    Private Bank resolved claims 81 via settlement
19    agreement, do you see that?
20 A  Yes.
21 Q  And that that settlement agreement was filed with
22    the Court on February 5th, 2016, doc 509; do you
23    see that?
24 A  Yes.
25 Q  Okay, please turn to Exhibit 11, which is right

1 before the exhibit you were in.
2 A Okay.
3 Q And Exhibit 11, I'll represent to you that is the
4 settlement agreement that was referred to you in
5 your objection, and if you see it has doc number
6 509 at the bottom?
7 A Yes.
8 Q Okay. Now, is this, to the best of your
9 knowledge, the settlement and release agreement
10 that you had -- you and your wife had with
11 Private Bank and Trust Company?
12 A Yes.
13 Q And this agreement was meant to resolve guarantee
14 liability?
15 A Ask that again.
16 Q Well, let me back up. It states that Mark S.
17 Neighbors and Shelly K. Neighbors and it refers
18 to you both collectively as guarantees --
19 guarantors, did you have guarantee debt owed to
20 private bank?
21 A Neighbors Investments had loans with Private
22 Bank.
23 Q So Neighbors Investments was the primary obligor
24 on the Private Bank loans?
25 A Wait a minute, I may not be right about that.

1 Stillwell Industrial and Metcalf 211, Inc.
2 Q And that is refer to in this agreement if you
3 look at the first page?
4 A Okay.
5 Q So it wasn't Neighbors Investments --
6 A No.
7 Q -- it was Stillwell Industrial and Metcalf 211
8 and those are other entities that you have an
9 ownership interest in?
10 A Yes.
11 Q And these two loans, were these loans that you
12 and Ms. Neighbors personally guaranteed?
13 A I don't think so.
14 Q All right. Well, if you turn to the next page,
15 paragraph -- on page 2, paragraph C --
16 A Page 2-C.
17 Q And it says: The full payment and prompt
18 performance of borrowers' obligations evidenced
19 by the loan documents have been unconditionally
20 and irrevocably guaranteed about the guarantors
21 pursuant to the following commercial guaranty
22 agreements, and it lists guaranty dated August
23 31st, 2007 and -- or two commercial guarantees,
24 dated by -- executed by you and one executed by
25 your wife on August 31st, 2007; do you see that?

1 A Yes, I do, it says commercial guaranty dated
2 August 31, yes.
3 Q Does this refresh your memory that you had
4 guarantee liability to Private Bank?
5 A It says a commercial guarantee, not a personal
6 guarantee.
7 Q Were you --
8 THE COURT: Are you going to argue
9 about the definition of the commercial guarantee?
10 Because I know what it means.
11 THE WITNESS: Well, I think there's a
12 big difference.
13 THE COURT: Huh-uh. You privately
14 guaranteed a commercial loan.
15 THE WITNESS: Okay.
16 THE COURT: I believe. But for the
17 purpose of this hearing, it's irrelevant and if
18 it becomes relevant, we will -- we will delve it
19 into.
20 A Well, we had a settlement agreement with them in
21 2012. And as Camron has pointed out, they
22 haven't been here, we thought we had a settlement
23 agreement.
24 Q (By Mr. Johnson) Well, you said you thought
25 you had a settlement agreement. Do you not

1 believe you have a settlement agreement?
2 A No, we do have a settlement agreement. The way
3 you're asking the question, though, you're
4 implying that there isn't a settlement agreement.
5 Q Well, the agreement was dated March 12, 2012,
6 correct?
7 A Let me be accurate here, March 7, 2012.
8 Q Yes, March 7.
9 A Okay.
10 Q And is that when the settlement took place?
11 A That's when we signed the settlement agreement,
12 yes.
13 Q Okay. Now, if you go to page 2 of 2, or
14 paragraph 2 on page 2, says: Released by lender.
15 Do you see that paragraph?
16 A Yes.
17 Q And it appears that you got a full release from
18 Private Bank; is that correct?
19 A That's what it shows.
20 Q And in paragraph four, it appears that you gave
21 Private Bank a full release of any claims that
22 you had against them?
23 A That's what it appears to be, yes.
24 Q Is that your understanding of what the agreement
25 was?

Heritage Reporting Service    www.heritageekcmo.com
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 1:21-cv-... Doc# 678-1 Filed 10/24/16 Page 27 of 44    Page: 27

1 A  Yes.

2 Q  And at the time you signed this agreement, did

3     you believe you had claims against the Private

4     Bank?

5 A  No.

6 Q  Okay.  Was this something insisted by the Private

7     Bank to be included in this agreement?

8 A  We didn't have any problems with Private Bank.

9 Q  So that release, you didn't believe you had any

10    claims at the time but if you did, you released

11    them under this agreement?

12 A  Yes.  We didn't, we didn't have any claims

13    against them.

14 Q  Now, paragraph 5 of the agreement on page 3

15    states that:  The substance and contents of this

16    agreement shall be kept confidential by the

17    parties subject to disclosure in a public venue

18    or court only if lender has a legitimate need to

19    include such information as part of any claim or

20    proof of claim.

21        Do you see that?

22 A  Yes.

23 Q  Did you file this settlement agreement with the

24    Court?

25 A  Yes, I did.

1 Q  And did you get the consent of Private Bank

2     before you filed it?

3 A  No, I did not.

4 Q  And did you seek or did anyone on your behalf

5     seek bankruptcy court approval on this agreement?

6 A  Erlene Krigel was involved in this, so you'd have

7     to ask her that question.

8 Q  Other than filing it when you filed it in

9     February of 2016, are you aware of any other

10    pleading or motion that was filed on your behalf

11    that disclosed this settlement agreement?

12 A  I don't know the answer to that.

13 Q  Did you ask the Private Bank to withdraw that

14    claim before you filed your objections?

15 A  No.

16 Q  Did anyone on your behalf ask Private Bank to

17    withdraw that claim before you filed your

18    objection?

19 A  No, but I will tell you that we got a 1099 from

20    Private Bank that we were fully settled.  Since

21    you listed it on your motion to convert us, I had

22    to clear the records up so the courts knew what

23    settlement agreements had taken place.

24        Now, was it up to Erlene Krigel to

25    inform the Court?  Probably.  And whether she did

1     or not, I don't know the answer to that.  I took

2     it upon myself to inform the courts that what you

3     stated in your motion to convert was inaccurate.

4 Q  And you did that by filing the settlement

5     agreement and the claim objection?

6 A  I did that by filing the settlement agreement.

7 Q  Okay.  If you could turn back to Exhibit 6, real

8     quickly, on Private Bank, did you ask your

9     attorney or did you do any of your own

10    investigation as to any claims that you may have

11    against the Private Bank?

12 A  We didn't have any problems with Private Bank.

13    You keep asking that question.

14 Q  The question was:  Did you do any investigation

15    as to any claims that you may have had against

16    the Private Bank?

17 A  No.

18 Q  Okay.  Thank you.  All right, back to Exhibit 6,

19    you can turn to page 8 of 12.  And see claim

20    number 18 filed by Graves, Bartle, Marcus &

21    Garrett; do you see that?

22 A  Yes.

23 Q  And is it your understanding that they're now

24    referred to as the Garrett Graves Law Firm?

25 A  No, I didn't know that.

1 Q  I'll represent to you that they have since

2     changed their name.

3 A  Okay.

4 Q  Okay.  Now, is it correct that on August 4, 2011,

5     it filed a claim in the amount of $2,502.02?

6 A  Yes, they did.

7 Q  Okay.  If you could turn to Exhibit 20 in the

8     book in front of you --

9 A  Okay.

10 Q  -- and the document's the withdrawal of claim; do

11    you see that?

12 A  Yes.

13 Q  Now, did you or anyone on your behalf ask Graves

14    Bartle to withdraw their proof of claim?

15 A  We paid them.

16        THE COURT:  Again, this is a yes or

17    no --

18 A  Yes.

19 Q  (By Mr. Johnson)  Okay.  And why did you ask

20    them to withdraw their claim?

21 A  Because they were paid.  This was a bill that we

22    would have paid a long time ago, but it's an

23    insignificant amount.

24 Q  And what funds did you use to pay that claim?

25 A  I don't know the answer to that.

1 Q  Did you have any other agreement with them with
2    respect to the withdrawal of the claim?
3 A  No.
4 Q  And did you prepare this form for them?
5 A  No.
6 Q  They prepared it themselves?
7 A  Yes.
8 Q  And when was this claim paid?
9 A  It would have been February of 2016.
10 Q  Okay.  Back to Exhibit 6, if you could turn to
11    page 5 of 12.
12 A  Okay.
13 Q  And do you see claim number 12, Mark Murphy?
14 A  Yes.
15 Q  All right.  And is it correct that on June 15th
16    2011, Mr. Murphy filed a claim in the amount of
17    $2,997.46?
18 A  Yes.
19 Q  Now, if you could turn to Exhibit 16.
20 A  Yes.
21 Q  Now, did you or anyone on your behalf ask the
22    firm to withdraw its claim or Mr. Murphy to
23    withdraw his claim?
24 A  Yes.
25 Q  And why did you ask him to withdraw his claim?

1 A  Because they'd been paid.
2 Q  When were they paid?
3 A  January or February of '16.
4 Q  What was the source of the funds that you used to
5    pay them?
6 A  I don't recall.
7 Q  Do you know who would no?
8 A  It's in the records somewhere.
9 Q  When you say it's in the records, are those bank
10    records?
11 A  You know, I don't know the answer to that.
12 Q  Do you do your own bookkeeping?
13 A  No.
14 Q  Would somebody else have cut -- was it paid by
15    check?
16 A  May have been paid by cashier's check.  Could
17    have been a check.  Could have been.  It wasn't
18    cash.
19 Q  Wasn't cash.  And was that a check on behalf of
20    you and Ms. Neighbors?
21 A  It was on behalf of -- you know, you're trying to
22    say did it come out of our personal account, I
23    don't know.  I don't know the answer.
24        THE COURT:  Thank you.  He doesn't
25    know.

1        MR. JOHNSON:  Thank you, Your Honor.
2 Q  (By Mr. Johnson)  And then, finally, there was
3    some discussion about the Bank of Versailles at
4    the front end of this hearing.  Sitting here
5    today, do you believe you have claims against
6    the Bank of Versailles?
7 A  Well, like I said earlier about another bank,
8    we're mad at them.  So whether we have claims or
9    not, I'm not certain.  I'm not an attorney and I
10    don't know what claims are or whether we have the
11    ability to or whether there is, I don't know the
12    answer to that.
13 Q  If you had the ability to pursue a claim, would
14    you?
15 A  There was a settlement here.  And so there's --
16    there would be restrictions.
17 Q  So did you have a formal settlement agreement
18    with Bank of Versailles?
19 A  There was a -- there's multiple properties here,
20    before Neighbors Investments and we had our
21    personal lake house.  So there would be multiple
22    answers.  Ask me the question again.
23 Q  Did you have any written settlement agreements
24    with Bank of Versailles regarding --
25 A  Yes.

1 Q  -- their claims?
2 A  Yes.  Yes.
3 Q  And are you aware of whether or not those
4    agreements were submitted and approved by the
5    Court?
6 A  I don't know the answer to that.  Erlene Krigel
7    was involved in that.  She would be able to
8    answer that question for me.
9        MR. JOHNSON:  Your Honor, I have no
10    further questions at this time.
11        THE COURT:  Cross-examination.  Oh,
12    I'm sorry.
13        MR. HOORFAR:  We might have forgotten
14    the Trustee, Your Honor.
15        THE COURT:  I apologize profusely.  Do
16    you need a break, Mr. Neighbors?
17        THE WITNESS:  Yes, that would be great.
18        THE COURT:  Let's get back here at
19    least by 3:00.
20        THE CLERK:  Please rise.
21        (Brief recess.)
22        THE CLERK:  All rise.  You may be
23    seated.
24        MR. JOHNSON:  Ms. Hamilton.
25        MS. HAMILTON:  Thank you, Your Honor.

1  CROSS-EXAMINATION
2  BY MS. HAMILTON:
3  Q  Mr. Neighbors, you understand you're still under
4     oath?
5  A  Pardon me?
6  Q  Do you understand that you are still under oath?
7  A  Yes.
8  Q  All right. I'd like you to turn to Exhibit C2, C
9     as in cat, that's the Freddie Mac standard
10    modification agreement.
11 A  Okay.
12 Q  And would you agree with me that in the first
13    line, it indicates the borrowers are Mark
14    Neighbors and Shelly Neighbors?
15 A  Yes.
16 Q  And if you would turn to page 7 of 7, that's the
17    signature page -- you see 7 of 7 there at the
18    bottom right-hand corner?
19 A  Oh, yes.
20 Q  Do you see that was signed on -- is that your
21    signature --
22 A  Yes.
23 Q  -- individually?
24 A  Yes.
25 Q  Do you recognize your wife, Shelly Neighbor's

1     signature?
2  A  Yes.
3  Q  And she also signed individually?
4  A  Yes.
5  Q  All right. And so your LLC, Mark and Shelly
6     Neighbors or Shelly and Mark Neighbors, LLC was
7     not a party to the modification agreement; is
8     that correct?
9  A  I'm not certain of the answer to that.
10 Q  Would you agree with me that the document would
11    speak for itself as to who the parties to the
12    agreement were?
13 A  I think that there's other language somewhere
14    that states that our LLC was involved in this.
15 Q  And where do you think that language might be?
16 A  I'm not certain.
17 Q  Have you seen any document like that?
18 A  I believe there is somewhere.
19 Q  You believe you've seen that or do you just
20    believe it exists?
21 A  I believe there is somewhere.
22 Q  But would you agree with me it's not been
23    produced today?
24 A  Pardon me?
25 Q  Would you agree with me that it has not been

1     produced today?
2  A  Are you counting all this as produced today?
3  Q  Have you seen a document today that references a
4     Nationstar settlement that involved --
5  A  Yes.
6  Q  -- Mark and Shelly Neighbors or Shelly and Mark
7     Neighbors?
8  A  Yes, Mark and Shelly Neighbors, LLC is on Exhibit
9     C3.
10    THE COURT: We don't have an
11    Exhibit C3.
12    MS. HAMILTON: We do, Your Honor. It's
13    actually the settlement statement from the real
14    estate closing.
15 Q  (By Ms. Hamilton) Is that the exhibit you're
16    referring to, Mr. Neighbors?
17 A  Yes.
18 Q  You understand that that settlement statement is
19    actually --
20    THE COURT: Well, the Court -- let me
21    see. I don't think the Court has an Exhibit C3.
22    MS. HAMILTON: I apologize, Your Honor.
23    I can hand you one. It's a one-page exhibit,
24    Your Honor.
25    THE COURT: Let me have -- if I have

1     it, I don't know where it is.
2     MS. HAMILTON: Let me hand you, if I
3     may.
4     THE COURT: Thank you.
5  Q  (By Ms. Hamilton) So, Mr. Neighbors, this is a
6     settlement statement, correct, it's not a
7     settlement agreement? Do you understand the
8     difference between a settlement agreement and a
9     settlement statement?
10 A  Yes, Ms. Hamilton. You asked me was there any
11    documents that reflected the LLC, and so I
12    pointed out C3.
13    THE COURT: We'll accept that as an
14    answer.
15    MS. HAMILTON: Thank you, Your Honor.
16 Q  (By Ms. Hamilton) Now, in response to
17    questions from Mr. Johnson, I think he was
18    asking what you had done with the settlement
19    statement proceeds that you have there
20    referenced on C3. But isn't it true, as a part
21    of the settlement agreement with Nationstar,
22    that you also received funds directly from
23    Nationstar?
24 A  Yes.
25 Q  What did you do with those funds?

1 A   We deposited them.
2 Q   In what account?
3 A   I'm not certain.
4 Q   And did you disclose --
5 A   In the LLC?  An LLC account.
6 Q   And you are now asking Shelly Neighbors for that
7       answer?
8 A   Yes.
9 Q   Do you know, Mr. Neighbors?
10 A   No, I don't know.
11 Q   All right.  Do you recall actually receiving
12      those proceeds?
13 A   Yes, there was -- yes, there was a check, yes.
14 Q   How were those funds spent?
15 A   Primarily to pay attorneys.
16 Q   Which attorneys did you pay?
17 A   Erlene Krigel, probably Christina Merzack
18      (phonetic), John Reynolds, Camron Hoorfar.
19 Q   Anyone else?
20 A   Now, you asked me did we take those proceeds and
21      pay those attorneys.  I don't know the answer to
22      that.  I don't know how -- exactly what funds
23      came from what account to pay the attorneys.
24 Q   Do you know what account you deposited them into?
25          THE COURT:  He's already said that he,

1       if I had to pick an answer, he believes it was
2       deposited into an LLC account that -- the
3       Neighbors, LLC account.
4           MS. HAMILTON:  Your Honor, if I could,
5       I'd like to hand him an exhibit to help him
6       refresh his recollection.
7           THE COURT:  That's fine.
8           MS. HAMILTON:  I'm going to mark this
9       as T1, T as in Trustee.
10          THE WITNESS:  Okay.
11 Q   (By Ms. Hamilton)  And you will see at the
12      bottom there's a HOORFAR02816, do you see that
13      very small that I will refer to as Bates stamp
14      there at the very bottom?
15 A   Right.
16 Q   So these are records that were provided by your
17      counsel, so that first page, is that one of the
18      settlement checks that you received in connection
19      with the --
20 A   Yes.
21 Q   All right.  And then if you continue on to the
22      next page, which is 2817 at the bottom --
23 A   Yes.
24 Q   -- are those also checks that you received from
25      Nationstar?

1 A   Something doesn't look quite right here.
2           THE COURT:  You're on page 2 now,
3       right?
4           MS. HAMILTON:  Correct.
5 Q   (By Ms. Hamilton)  Let's just look at page 2
6       first, Mr. Neighbors, do you see those are
7       checks, two checks, from Nationstar?
8 A   Uh-huh.
9 Q   And that's a yes?
10 A   I see them.  There's two checks.
11 Q   And one is dated March 27, 2015 for $10,000 and
12      the second is dated April 20, 2015 for
13      $57,237.41; do you see that?
14          MR. HOORFAR:  Your Honor, I have to
15      object to these checks.  Number one, I don't know
16      what the relevancy of CitiMortgage existing as to
17      other creditors or not; but number two, these are
18      not true and accurate copies of these checks.
19      Someone has put, on page 2, some sort of bank
20      statement deposit document over part of the
21      check, and there's another document underneath
22      that it seems like.
23          So clearly under the best evidence
24      rule, I'd like to have an actual copy of the
25      document, if we're going to review it and not

1       something that has been layered upon layered last
2       minute at the hearing, in addition to the
3       relevance of this Your Honor.
4           MS. HAMILTON:  For the record, Your
5       Honor, these were records that were produced by
6       Mr. Hoorfar.
7           THE WITNESS:  I think I can clear up
8       some of the questions.
9           THE COURT:  Let me ask one question.
10      What -- these are all dated --
11          MS. HAMILTON:  2015.
12          THE COURT:  But they're in March and
13      April.
14          THE WITNESS:  Your Honor, there was --
15          THE COURT:  Just a second.  And I
16      thought he testified that the property was sold
17      in August.
18          MS. HAMILTON:  And, Your Honor, there
19      was proceeds received from the sale of the
20      property and there were proceeds received under
21      the settlement agreement.  So Mr. Johnson had
22      inquired about how the proceeds from the sale of
23      the property, which was in August, were spent.
24      I'm inquiring as to the how the settlement
25      proceeds received by Mark and Shelly Neighbors.

1 THE COURT: Thank you. I totally
2 missed that.
3 MS. HAMILTON: I apologize.
4 THE COURT: Well, no. I'm sure it was
5 me.
6 MR. JOHNSON: I'm pretty sure it was
7 me, Your Honor.
8 MS. HAMILTON: Well, then in response
9 to Mr. Hoorfar's objection, these are the records
10 that the Debtor has produced to me --
11 MR. JOHNSON: Right.
12 MS. HAMILTON: -- with the Bates stamp.
13 And I'm simply -- I'm presenting them to
14 Mr. Neighbors to refresh his recollection, first
15 of all, when he received the funds; and if we
16 follow through, we'll be able to see how the
17 funds are taken out of the account.
18 And again, the question is were
19 creditors paid. So I'm trying to refresh
20 Mr. Neighbors' recollection so that he can answer
21 that question.
22 THE COURT: And he had the relevancy
23 objection.
24 MR. HOORFAR: Correct, Your Honor.
25 THE COURT: And several others, but --

1 MR. HOORFAR: Yes, Your Honor. So in
2 regards to the relevancy issue, whether or not
3 the Neighbors were paid settlement proceeds and
4 whether or not that money was paid to creditors
5 doesn't answer the question or doesn't really go
6 to anything in regards to who is still a creditor
7 now. So if the documents are being used to show
8 that the creditor now doesn't exist --
9 THE COURT: I'm going to reserve my
10 ruling on the relevancy issue until I hear this
11 question and the rest of them.
12 Q (By Ms. Hamilton) So Mr. Neighbors --
13 THE COURT: And remind me when we get
14 to the end.
15 Q (By Ms. Hamilton) So we're on page 2,
16 Mr. Neighbors, and we see that there are the
17 two checks, correct?
18 A Correct.
19 Q And a deposit slip on that page?
20 A That's correct.
21 Q And do you know whose handwriting is on the
22 deposit slip?
23 A I don't know for sure. It may be Shelly's, but
24 I'm not certain.
25 Q And then if you would turn back now to 2822 --

1 and if you will follow those Bates numbers at the
2 bottom -- I believe, I'd like you to tell me if
3 you agree, is this another copy of the settlement
4 proceeds --
5 A Yes.
6 Q -- received in connection with the Nationstar
7 settlement?
8 A Yes.
9 Q All right. And then if you turn to the next
10 page, 2823, again is that another copy of that
11 same settlement statement?
12 A It's a copy of --
13 Q I'm sorry, the check?
14 A The check.
15 Q All right. And now let's turn to 2806, again
16 that's at the very -- just keeping turning back a
17 couple more pages -- is this the Freedom Bank
18 account statement for you and Shelly?
19 A What number are you on?
20 Q 2806, at the bottom 2806.
21 A 2806.
22 THE COURT: Next to the last page.
23 MS. HAMILTON: Your Honor, if I may
24 approach.
25 A Oh. Okay.

1 Q (By Ms. Hamilton) All right. Is this the
2 Freedom Bank statement for a bank account that
3 you and Shelly have at Freedom Bank?
4 A Yes.
5 Q And does it show a deposit of $10,000 on April 2,
6 2015?
7 A Yes.
8 Q And a deposit of $67,237.41 on the same date?
9 A Yes.
10 Q All right. And then there are a series of
11 withdrawals?
12 A Uh-huh.
13 Q Yes?
14 A Yes.
15 Q As you sit here today, do you have any
16 recollection where those funds went when they
17 were withdrawn from this bank account?
18 A No, I don't.
19 Q Did anyone other than you and Shelly have the
20 right to withdraw money from the Freedom Bank
21 account that we're looking at, that ends in 6568?
22 A No.
23 MS. HAMILTON: Your Honor, I'd like to
24 offer Exhibit T1.
25 THE COURT: And Mr. Hoorfar, you have a

1 relevance objection?

2 MR. HOORFAR: That's correct, Your

3 Honor. I don't know under the limited scope of

4 this pretrial order that we all agreed to,

5 whether this has anything to do with that. The

6 fact that Mr. Neighbors received funds as a part

7 of a settlement and then disbursed those funds as

8 part of a settlement has nothing to go do with

9 how many creditors stand before us today.

10 THE COURT: I'm going to sustain the

11 objection for that, for this hearing, for whether

12 or not these documents are relevant to whether

13 there's only one creditor existing in this

14 bankruptcy.

15 Q (By Ms. Hamilton) But, Mr. Neighbors, as you

16 sit here today, can you tell the Court what you

17 did with the settlement funds that you received

18 from Nationstar under the settlement agreement

19 that were deposited in the Freedom Bank

20 account?

21 A Well, we paid bills.

22 Q In response to questions from Mr. Johnson, you

23 indicated that Central Bank of the Ozarks had

24 four claims and that eventually, two separate

25 pieces of real property were sold; is that

1 correct?

2 A Yes.

3 Q And I believe your testimony was those properties

4 were sold for an amount in excess of the balance

5 owed on the note that was secured by the deed of

6 trust encumbering those properties?

7 A Yes.

8 Q And do I have the amount right $390,000?

9 A Yes. Approximately.

10 Q Absolutely. Who owned the real property at the

11 time of the successor trustee sale?

12 A Gentle Slopes Partners, LLC.

13 Q And do you or Shelly have an interest -- at the

14 time of this sale, did you or Shelly have an

15 interest in Gentle Slopes Partners, LLC?

16 A No. Neighbors Investments did.

17 Q And did Neighbors Investments receive any of the

18 proceeds from the sale of that property?

19 A No.

20 Q Pardon me?

21 A No.

22 Q Why is that? If there was an amount in excess,

23 what happened to the excess funds?

24 A We didn't get any.

25 Q What happened to the funds?

1 A I don't know the answer to that. We didn't

2 receive any of it.

3 Q Have you made inquiry?

4 A Yes.

5 Q To who?

6 A Through Erlene.

7 Q And who was Erlene Krigel inquiring?

8 A Back to Central Bank.

9 Q And so your testimony is that as you sit here

10 today, you don't know what happened to the

11 $390,000 in excess proceeds?

12 A We believe that we were supposed to receive half

13 of that, but we never received any of it.

14 THE COURT: Mr. Neighbors, could you

15 pull the mic a little closer to you?

16 THE WITNESS: Sorry.

17 Q (By Ms. Hamilton) All right. So your

18 testimony is, as you sit here today, do you

19 believe that you and Shelly, through your LLC,

20 are still entitled to half those proceeds?

21 A We believe that there should have been -- yeah,

22 yeah, yes. Investments. Through Investments.

23 Q Through your interest in Neighbors Investments?

24 A Yes.

25 Q And so who would the claim be asserted against

1 other than Central Bank? Was there an actual

2 buyer of the property?

3 A David Baumgarner with Ospry Lane, LLC.

4 Q Do you think you have claims against

5 Mr. Baumgarner?

6 A You're asking me legal questions that I don't

7 have the answer to.

8 Q Now, in regard to Farmers claim which was

9 discussed between by Mr. Johnson, do you

10 recall ever signing a guaranty with any of the

11 Farmers obligations?

12 A No, I don't recall.

13 Q And if the Farmers proof of claim made a

14 reference to a personal guarantee, do you think

15 that was in error?

16 A It was a Neighbors Investments loan.

17 Q I understand, but whether or not you and Shelly

18 signed personal guarantees?

19 A I don't believe we signed a personal guarantee.

20 Q Well, does Neighbors investments have income to

21 pay any of its expenses?

22 A Currently, no. Well, not much.

23 Q Isn't it true that at one of your continued 341

24 meetings, we discussed that Neighbors Investment

25 was actually getting loans from you and Shelly or

1  your LLCs; is that correct?
2  A  Yes.
3  Q  So the payments that have been going to Farmers
4     has actually come from funds that you or your
5     LLCs had and then either paid directly to Farmers
6     or transferred to Neighbors Investment; is that
7     correct?
8  A  That's correct. And we were following the
9     article seven of the plan where it says that we
10    have the right to borrow and loan, infuse funds
11    from shareholders wherever necessary and prudent.
12 Q  Mr. Neighbors, could you share with us what
13    you're reading from?
14 A  This is -- let's see. This particular one is
15    document 167 of our personal -- let's see.
16 Q  And what is the caption? What's the name of the
17    document on the first page?
18 A  That's what I'm trying to get to. First Amended
19    Plan of Reorganization.
20 Q  And that was filed in your personal case?
21 A  Yes.
22 Q  And was your plan confirmed?
23 A  No.
24 Q  And didn't you request last year when you sought
25    to have your case dismissed, that -- didn't you

1  represent to the Court that you could not confirm
2  a plan? Wasn't that one of the arguments you
3  made to dismiss your case before your case was
4  converted that you could not confirm your plan?
5  A  I do not recall.
6  Q  All right. Well, in regard to Graves & Garrett,
7     I understand that you have a recollection of
8     having paid them something in 2016, what -- how
9     much did you pay them?
10 A  Whatever the claim amount was.
11 Q  Did you pay them any interest?
12 A  No.
13 Q  Did you negotiate with them on whether or not you
14    would pay them any interest?
15 A  They didn't ask for any.
16 Q  And do you know whether or not they'd be entitled
17    to interest?
18 A  They didn't ask for any. Whether --
19 Q  That's a different question?
20 A  Are they entitled to it?
21 Q  Yes.
22 A  I don't -- I think they were entitled to the
23    claim amount.
24 Q  But that claim amount arose prior to 2011,
25    correct, and you didn't pay it until 2016,

1  correct?
2  A  That's correct.
3  Q  So you don't know whether or not Graves & Garrett
4     would have been entitled to any interest in
5     connection with their claim?
6  A  I'm not a bankruptcy attorney. I don't know how
7     these things work.
8  Q  And you didn't obtain the Court's approval to pay
9     that prepetition claim, did you?
10 A  No.
11 Q  All right. And the funds you used may have come
12    from property of the bankruptcy estate, either
13    they settlement proceeds that we --
14 A  Could have been --
15 Q  Described or the real estate commission? Pardon
16    me?
17 A  Could have been a real estate commission, could
18    have been disability funds. We just wanted to
19    make sure all of our bills were paid so nobody
20    was racing to the courthouse steps.
21 Q  And Mr. Murray, do you recall how much you paid
22    them?
23 A  The amount that's on his claim.
24 Q  And same question: Was he entitled to interest?
25 A  Same -- same, I -- I'm not a bankruptcy attorney,

1  I don't understand.
2  Q  In regard to Bank of Versailles, I thought I
3     understand your testimony to be that you thought
4     there was a written or forma settlement agreement
5     with the Bank of Versailles; did I understand
6     that correctly?
7  A  There was a quit claim deed, there was -- there
8     was some written documentation, yes.
9  Q  My question is more narrow. Do you believe
10    there's a formal written settlement agreement?
11 A  I think that it was the settlement agreement.
12 Q  Was simply a quit claim deed?
13 A  I don't think it as simple as a quit claim deed.
14    There's multiple pages.
15 Q  Other parts of an agreement?
16 A  I don't have the information with me. There
17    was -- didn't we provide that to you?
18 Q  Do you recall filing a lawsuit in this bankruptcy
19    case against the Bank of Versailles?
20 A  Yes.
21 Q  Do you recall that that case was dismissed?
22 A  Yes, I do.
23 Q  That wasn't dismissed as a part of a formal
24    settlement agreement, was it?
25 A  I don't -- no.

1 Q  Do you recall during one of the continued 341
2    meetings, you indicate -- you testified that you
3    believed that you and your wife still had claims
4    benefits the Bank of Versailles?
5 A  Yes, we did.
6 Q  Do you still believe that today?
7 A  We are not attorneys.  So whether -- we've
8    already stated that we're upset with them.
9    Whether there's claims there or not, we don't
10   know.
11 Q  Now, have you been negotiating with anyone on
12    behalf of Erickson Solutions Group?
13 A  Not recently.
14 Q  When was the last time you negotiated with anyone
15    from Erickson Solutions?
16 A  It would have been sometime in 2015.
17 Q  You didn't contact Mr. Latessa, L-A-T-E-S-S-A,
18    the COO, and try to obtain some information from
19    Mr. Latessa?
20 A  Well, yes, that's when we talked to them, yes.
21 Q  In 2016?
22 A  It was Lasalla.
23 Q  And you spoke to him in 2016?
24 A  Was it '16.
25 Q  It was after conversion of your case, I believe.

1 A  Okay.
2 Q  Do you recall that conversation?
3 A  I recall talking to him, but I didn't know when
4    it was for sure.
5 Q  And what do you recall about that conversation?
6 A  That we were going to, that we wanted our records
7    from him, that we -- there was a written
8    agreement that he had imaged our server and held
9    it at his house.  And we wanted our -- we wanted
10   our information back.
11 Q  And when you say "we," who are you referring to?
12 A  Shelly and I.
13 Q  I believe during one of the continued 341
14    meetings, you testified that at times, you and
15    Shelly would use a d/b/a Neighbors Companies; do
16    you remember that?
17 A  Neighbors Company was a name that was used prior
18    to Linda Beetle coming up and working for us.
19 Q  And that was a d/b/a, was you and Shelly
20    personally; was it ever an entity registered with
21    the Secretary of State?
22 A  No, no, there was never any payments, no checks
23    written, no -- no.
24 Q  And have you paid all that you are obligated to
25    pay to Erickson Solutions?

1 A  We have a check ready for them, we provided that
2    to them, as soon as they give us our server
3    records.
4 Q  How much is that check?
5 A  I believe it's $5,400.
6 Q  And that's payable from what account?
7 A  Neighbors Investments.
8 Q  And why is it being paid from Neighbors
9    Investments?
10 A  Neighbors Investments is who hired Erickson
11    Solutions.
12       MS. HAMILTON:  Your Honor, if I may,
13    I'd like to hand him what has been marked as
14    Trustee's Exhibit T2.  It's a copy of the proof
15    of claim filed by Erickson Solutions Group.
16       THE COURT:  Very good.
17 Q  (By Ms. Hamilton) Page 2 of the proof of claim
18    that was filed, does that show that the invoice
19    went to Neighbors Companies?
20 A  Yes, it does.
21 Q  All right.  And then page 5 of 6, does that show
22    also that that bill went to Neighbors Companies?
23 A  Page 3 and page 4, Neighbors Investments; page
24    five of -- $40, it's Neighbors Companies.
25 Q  And just to be clear, Neighbors Investments

1    doesn't have income now, you're loaning, you
2    individually or Shelly individually or your LLCs
3    are loaning money to Neighbors Investments in
4    order to, for instance, write a check for $5,400
5    to Erickson Solutions; is that correct?
6 A  Yes.
7 Q  Now, Mr. Neighbors, I believe also that you
8    testified during the one of the continued 341
9    meetings that you owe money to your father; is
10    that correct?
11 A  Yes.
12 Q  And you have an agreement with him to pay him
13    when you sell some property; is that right?
14 A  Yes.
15       MS. HAMILTON:  Your Honor, I don't
16    believe I have any other questions at this time.
17    I would like to just ask the Court to take
18    judicial notice of Trustee's Exhibit T2.
19       MR. HOORFAR:  No objection, Your Honor.
20    This is a proof of claim that's been filed with
21    the Court.  We've already established that any
22    document filed with the Courts is fine.  We have
23    no problem with that, Your Honor.
24       THE COURT:  T2 will be admitted.  Thank
25    you.

1     (Trustee's Exhibit T2 received in
2     evidence.)
3          MR. HOORFAR: I wanted to make sure we
4     didn't forget anyone, Your Honor. It's my turn
5     this time.
6          CROSS-EXAMINATION
7     BY MR. HOORFAR:
8  Q  Now, Mr. Neighbors, I do have a couple of
9     questions for you in regards to what's been
10    brought up today, and I'm going to refer to a
11    couple of documents here and there. If you will
12    give me a moment, I'm going to grab a few of
13    them.
14         Now, Mr. Neighbors, the first seems
15    like issue that was brought up was this
16    Nationstar settlement and what it entails. And
17    one of those agreements, one of those documents
18    that was mentioned in regards to the Nationstar
19    settlement was what we're going to refer to as
20    C-1. It's entitled, "Settlement Agreement and
21    Release," at the top, if you could find that one
22    for me and let me know when you are ready.
23 A  Okay, I'm ready.
24 Q  Now, just to be clear, it is your understanding
25    that you have settled any and all disputes with

1  Q  Now, are you aware that Nationstar filed a claim
2     in your personal case?
3  A  Yes.
4  Q  Do you know why they would have filed a claim in
5     your personal case?
6  A  We -- we borrowed money from Bank of America or,
7     actually it was Countrywide.
8  Q  And just to be clear, it is your understanding of
9     this settlement agreement labeled C-1 that all
10    disputes have been resolved with you and
11    Nationstar?
12 A  Yes.
13 Q  If you can flip to page 4 of this document for
14    me -- well, I'm sorry, page 3, my mistake, page
15    3, at the very bottom, there's a heading of:
16    Mutual Release, Subsection I, Plaintiff's
17    Release. Do you see that down at the bottom?
18 A  Yes.
19 Q  Okay, now, I'm going to read this statement very
20    quickly, and you will me know if I've read it
21    correctly, it says: Plaintiffs release. For
22    consideration of the payment, the receipt and
23    sufficiency of which are hereby expressly
24    acknowledged, the Plaintiffs, for themselves,
25    and each of their present and former heirs,

1     Nationstar; is that correct?
2  A  Yes.
3  Q  And since the signing of this settlement
4     agreement and release, labeled C-1, has
5     Nationstar sent you any invoices?
6  A  No.
7  Q  Since this settlement agreement has been signed,
8     have they sent you any requests for money or
9     demands for payment of money?
10 A  No.
11 Q  Have they contacted you in any way?
12 A  No.
13 Q  Since the signing of this settlement agreement,
14    have you seen Nationstar in any other
15    proceedings --
16 A  No.
17 Q  -- in this court case?
18 A  No.
19 Q  Now, you had mentioned earlier that you had filed
20    an adversary proceeding against Nationstar; is
21    that correct?
22 A  Yes.
23 Q  Do you recall if that was in your personal case
24    or was it your business case?
25 A  I don't recall.

1     executors, administrators, partners, co-obligors,
2     co-guarantors, guarantors, sureties, family
3     members, spouses, attorneys, insurers, agents,
4     representatives, predecessors, successors,
5     assigns, and all those who claim through them, or
6     could claim through, them collectively known as
7     Plaintiffs or releasors.
8          Did I read all of that correctly?
9  A  Yes.
10 Q  Now, after reading that, and once you've digested
11    it, is it your understanding of this reading that
12    this would cover both you, your wife Shelly, and
13    anything else that you may own, businesses,
14    representatives, guarantors, or anything else; is
15    that your understanding?
16 A  Yes.
17 Q  So is it your understanding that through the
18    wording of what I've just read, you have some
19    other ability to make a claim against Nationstar
20    through anything else that you have an ownership
21    of or control of?
22 A  No.
23 Q  So if you can flip back to the first page of C-1,
24    where at the very top it says, This confidential
25    settlement agreement is made and entered into by

1    Plaintiffs Mark Neighbors and Shelly Neighbors,
2   is it your understanding that that paraphrase
3   corresponds with what I just read on page 3 to
4   cover anything and everything that you may own or
5   exist?
6 A  Yes.
7 Q  Okay. Now, you also testified that you sold the
8   property 16963, after this settlement agreement
9   was signed; is that correct?
10 A  Yes.
11 Q  And the sale of that as reflected in what is
12   marked as C-3, a HUD-1 settlement statement; is
13   that correct?
14 A  Yes.
15 Q  And at the very top of that settlement statement,
16   there's a section E that says name and address of
17   seller; do you see that?
18 A  Yes.
19 Q  And whose name is marked there?
20 A  Mark S. and Shelly K. Neighbors, LLC.
21 Q  And why would the LLC be listed there?
22 A  Because they were the owner.
23 Q  And is it your understanding that -- well, let me
24   back up first. I'm sorry. Who owns Mark S. and
25   Shelly K. Neighbors, LLC?

1 A  Shelly and I.
2 Q  And Shelly and you signed the settlement
3   agreement that I just referred to as C-1, is that
4   correct, the settlement agreement and release?
5 A  Yes. Yes.
6 Q  And you owned this LLC at the time that you
7   signed that settlement agreement; is that
8   correct?
9 A  Yes.
10 Q  And so is it your understanding that your LLC was
11   covered in the settlement agreement that you
12   signed with Nationstar?
13 A  Yes.
14 Q  So is it fair to say that your LLC does not have
15   the claim against Nationstar?
16 A  Yes.
17 Q  And is it also fair to say that Nationstar does
18   not have a claim against you, Shelly, or any of
19   your businesses?
20 A  Yes.
21 Q  And any of your businesses includes the LLC
22   mentioned on this settlement statement?
23 A  Yes.
24 Q  Now, I'm going to switch here to what's been
25   labeled as Exhibit D-29. It came with a set of

1   other documents regarding Nationstar. And up at
2   the top, it should be labeled U.S. Bankruptcy
3   Court District Of Kansas, Courtroom Minute Sheet,
4   March 26, 2015. Do you see that document?
5 A  Yes.
6 Q  Take as much time as you need to review what this
7   document is before I ask you questions about it.
8      THE COURT: What is document D-29?
9      MR. HOORFAR: It's marked D-29, Your
10   Honor. It should be one page.
11      THE COURT: My book seems to end at 28.
12      MR. HOORFAR: I apologize, Your Honor,
13   D-29 was added with the Nationstar settlement
14   documents when we came back at 1:30.
15      THE COURT: So it would be -- okay.
16   I've got it.
17      MR. HOORFAR: It should be the very
18   last one submitted to the Court at 1:30. I have
19   a copy here, Your Honor, if it's easier for you.
20      THE COURT: Probably would be.
21      MR. HOORFAR: May I approach?
22      THE COURT: Yes.
23 Q  (By Mr. Hoorfar) All right. Have you had
24   enough time to look at it?
25 A  Yes.

1 Q  And is it fair to say this is a courtroom minute
2   sheet of what happened on March 26, 2015?
3 A  Yes.
4 Q  Do you recall that day?
5 A  Yes.
6 Q  Can you tell me in your own words what happened
7   that day?
8 A  We were trying to get the settlement agreement
9   completed. And I think this was -- this may have
10   been the day where we agreed to all the
11   settlement and signed the documents.
12 Q  In the middle of the page there it says
13   appearances, there's an appearances section. And
14   underneath that, there is a part that says "in
15   person," do you see that that is in the document?
16 A  Yes.
17 Q  Are there three attorneys listed there that state
18   representing Nationstar Mortgage, LLC,
19   Christopher Stover, Jennifer Barhorst, Eric Roby?
20 A  Yes.
21 Q  And so is it your recollection that those
22   attorneys were in fact in the courtroom on
23   March 26, 2015?
24 A  Yes, they were.
25 Q  And down at the bottom of the page in all bold,

Heritage Reporting Service    www.heritagekcmo.com    Page: 37
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 11-21003   Doc# 678-1   Filed 10/24/16   Page 37 of 44

1 under the Notes/Decisions section, it reads: All
2 issues resolved. Settlement documents will be
3 signed and notarized today in the courthouse.
4        Do you see where it says that?
5 A  Yes.
6 Q  Is that an accurate description of what happened
7    that day?
8 A  Yes.
9 Q  So you did in fact sign the settlement agreement
10   on March 26th in this courthouse?
11 A  Yes.
12 Q  Was it in this courtroom?
13 A  Yes.
14 Q  Now, once this settlement was signed in front of
15   the Court, you later sold the property; is that
16   correct?
17 A  Yes.
18 Q  Was that sale a short sale?
19 A  No.
20 Q  It was a normal sale?
21 A  Yes.
22 Q  And at the time of the sale, in order to give
23   good title, Nationstar had to clear their lien;
24   is that correct?
25 A  Yes.

1 Q  Was Nationstar paid in full at that time?
2 A  Yes.
3 Q  And did Nationstar release their lien pursuant to
4    that payment in full?
5 A  Yes.
6 Q  And was good clear title given to the buyers of
7    that property?
8 A  Yes.
9 Q  So is it fair to say that you have fully paid
10   Nationstar?
11 A  Yes.
12 Q  And is it also fair to say that you or any of
13   your affiliated entities cannot assert a claim
14   against Nationstar?
15 A  Yes.
16 Q  And isn't it fair to say that Nationstar cannot
17   assert against you or any of your affiliated
18   entities a claim?
19 A  Yes.
20 Q  And they cannot ask for any money?
21 A  Yes.
22 Q  Now, I realize that Nationstar or its counsel are
23   not here today, but do you believe that
24   Nationstar wishes to undo the settlement you
25   entered into with them?

1 A  No.
2 Q  Have you received any communication from them
3    that says as such?
4 A  No.
5 Q  Have you received any communication that says
6    that Nationstar is in any way unsatisfied with
7    either the settlement agreement, the settlement,
8    or the sale of 16963?
9 A  No.
10 Q  So in your view, Nationstar is satisfied, happy,
11   and done; is that correct?
12 A  Yes.
13 Q  Let's talk about if the settlement was undone,
14   what you believe would happen. If this
15   settlement was --
16        THE COURT: Is this really relevant?
17        MR. HOORFAR: Your Honor, I only bring
18   it up because I believe that opposing counsel is
19   attempting to either make reference to or at a
20   later time will try to undo the Nationstar
21   settlement in order to obtain any proceeds from
22   that settlement to use to pay --
23        THE COURT: Okay, but that's not --
24   that's not in the issues before me today.
25        MR. HOORFAR: No problem, Your Honor.

1 I can skip that.
2        THE COURT: I mean --
3        MR. HOORFAR: I'm fine skipping that.
4        THE COURT: I only have a couple of
5 questions about Nationstar and some thoughts, but
6 I'm not going to burden the record with them
7 either.
8        MR. HOORFAR: That concludes my
9 Nationstar questions, Your Honor.
10        THE COURT: Okay.
11 Q  (By Mr. Hoorfar) Mark, it was recently brought
12   by a Trustee a proof claim filed by Erickson
13   Solutions, and it is marked T-2. Do you happen
14   to have that document?
15 A  Yes.
16 Q  Okay. And the top left of that document, it
17   says: Name of Debtor. Do you see where that is?
18 A  Yes.
19 Q  Can you read that for me?
20 A  Neighbors Investments, Inc.
21 Q  And to the right of that, there's a case number
22   there. Do you see that?
23 A  Yes, it's 11-21022.
24 Q  And is that the case number for the Neighbors
25   Investments, Inc., bankruptcy case?

1 A  Yes.

2 Q  So is it fair to say that this is a proof of
3    claim that was filed the Neighbors Investments
4    case?

5 A  Yes.

6 Q  Do you know if a proof of claim was filed in your
7    personal case by Erickson?

8 A  There was not a one filed in our personal.

9 Q  Okay.  And down at the very bottom of that page,
10   it should say Case 11-21022, claim 6-1; do you
11   see that?

12 A  Yes.

13 Q  So again you recognize this as a proof of claim
14   filed in Neighbors Investments case and not your
15   personal bankruptcy case?

16 A  Yes.

17 Q  Did you have a confirmed plan in Neighbors
18   Investments bankruptcy case?

19 A  Yes.

20 Q  And have you been following what's set out in the
21   confirmed plan?

22 A  Yes.

23      THE COURT:  How is that relevant to
24   this hearing?

25      MR. HOORFAR:  Your Honor, I'm going to

1    got to whether -- it was brought up with payments
2    made to Erickson.  And I'm going to bring up why
3    payments were being made and differentiate that
4    it was -- my line of questioning will show that
5    the payment is being made by Neighbors
6    Investments for the confirmed plan, not because
7    of the individual Mark and Shelly case.

8       THE COURT:  Okay.  I'll overrule
9    myself.

10      MR. HOORFAR:  Thank you, Your Honor.

11 Q  (By Mr. Hoorfar)  As part of that confirmed
12   plan, Mark, were you required -- was Neighbors
13   investments required to make payments to
14   Erickson Solutions?

15 A  Yes.

16 Q  And you had mentioned previously that you are
17   withholding a check to Erickson Solutions until
18   they give you some information; is that correct?

19 A  That's correct.

20 Q  Is that a check from you personally or from
21   Neighbors Investments, Inc.?

22 A  Neighbors Investments.

23 Q  Is that a check from Neighbors Investments
24   because of the confirmed plan that Neighbors
25   Investments has in place?

1 A  Yes.

2 Q  And what is the source of those funds?

3 A  We would probably loan money to Neighbors
4    Investments to pay.

5 Q  Was there a settlement that was entered into that
6    resulted in $22,500 being received by Neighbors
7    Investments?

8 A  Yes.

9 Q  And because of those settlement proceeds, that
10   were received by the business, did the confirmed
11   plan mention what happened to any settlement
12   proceeds and what would need to be disbursed?

13 A  I believe it did.

14 Q  And did the confirmed plan set forth a percentage
15   of what needed to be sent to an unsecured based
16   upon any settlement proceeds?

17      MS. HAMILTON:  Your Honor, if I can
18   just lodge an objection.  Your Honor, you have
19   this under advisement.  The settlement proceeds
20   that Mr. Hoorfar is referring to and asking
21   Mr. Neighbors to testify about are the Linda
22   Beetle settlement proceeds which that settlement
23   agreement provided that those funds would go to
24   Mark Shelly and Neighbors.  And I've asked for
25   turnover and Your Honor has that under

1    advisement.  So that I believe line of
2    questioning, I'm not sure how it's relevant, but
3    it's certainly in a contested manner that is
4    under advisement by the Court.

5       THE COURT:  The objection is noted.
6    I'm going to overrule it.

7       MR. HOORFAR:  Thank you, Your Honor.

8 Q  (By Mr. Hoorfar)  So is it fair to say
9    Mr. Neighbors, that the check that you have to
10   Erickson Solutions is pursuant to a confirmed
11   plan that Neighbors Investments had because of
12   settlement proceeds that you received?

13 A  Yes.

14 Q  And those funds are not coming from your personal
15   bankruptcy case?

16 A  That is true.

17 Q  And those funds are not coming from your personal
18   bank account?

19 A  That's true.

20 Q  Lastly, Mr. Neighbors, I'd like you to flip to
21   Stipulated Exhibit S-67.  It should be in the
22   gigantic binder you have there, may even be the
23   second binder.  You let me know when you've got
24   it.

25 A  I've got it.

1 Q I'm sorry, let's back up to 66, my apologies. My
2 mistake. Let's back up one to S-66. Let me know
3 when you have it.
4 A I have it.
5 Q Is this document entitled, Order Granting Motion
6 Fixing Deadline To File Proof of Claim?
7 A Yes.
8 Q And on the second paragraph there, is there a
9 date that the Court has set for the proof of
10 claim deadline?
11 A April 25, 2011.
12 Q So it's your understanding, then, that the
13 initial deadline to file a proof of claims in
14 your Chapter 11 would have been August 15, 2011;
15 is that correct?
16 A So -- yes.
17 Q And to your knowledge, after August 15th, 2011,
18 have any creditors filed any proofs of claim?
19 A No.
20 Q Are you aware that there is a second proof of
21 claim deadline that was set when your case was
22 converted to a Chapter 7?
23 A Yes.
24 Q If you can flip to stipulated number 67, just the
25 next page.

1 A I have it.
2 Q If you can look over this document for me, and
3 once you've read it, can you confirm that the
4 second proof of claim deadline is July 29, 2016?
5 A Yes, that's correct.
6 Q And that's the deadline, the second deadline in
7 your Chapter now 7 case; is that correct?
8 A Yes.
9 Q Okay. And since that time, since July 29th,
10 2016, have any creditors filed any proofs of
11 claim?
12 A No.
13 Q Between the two dates, have any creditors filed
14 any proofs of claim?
15 A No.
16 Q Between the two dates, have any creditors
17 demanded any payment from you?
18 A No.
19 Q Since July 29, 2016, have you received any
20 written demands from creditors other than
21 CitiMortgage for payment?
22 A No.
23 Q Since July 29th, 2016, have you received any oral
24 or other demands from creditors other than
25 CitiMortgage for payment?

1 A No.
2 Q Other than CitiMortgage, since this July 29th,
3 2016 deadline, has anyone made a personal -- or
4 made a demand for you personally for any money?
5 A No.
6 MR. HOORFAR: No further questions,
7 Your Honor.
8 THE COURT: Any redirect?
9 MR. JOHNSON: Briefly, Your Honor.
10 REDIRECT EXAMINATION
11 BY MR. JOHNSON:
12 Q With respect to the settlement agreement that you
13 signed with Nationstar here in court in March of
14 2015, once that settlement agreement and
15 modification agreement were executed, did you
16 have continuing payment obligations to Nationstar
17 under those agreements?
18 A Yes.
19 Q And you later sold the property in August of
20 2015, correct?
21 A Correct.
22 Q And your counsel was talking about that
23 Nationstar had to provide some type of lien
24 release, do you remember him inquiring about
25 that?

1 A I remember him mentioning that.
2 Q Is it your recollection that Nationstar provided
3 such a lien release?
4 THE COURT: You've testified that they
5 did.
6 THE WITNESS: Yeah, well, we sold the
7 property.
8 THE COURT: You testified that they
9 released their lien.
10 THE WITNESS: Yeah, and we gave them
11 clear title.
12 Q (By Mr. Johnson) Okay. Do you have a copy of
13 that lien release that was provided by
14 Nationstar?
15 A I don't know.
16 Q Do you recall reviewing it?
17 A When we went to close, the normal process is to
18 get title insurance and give clear title to the
19 property, and that's what we did.
20 Q Was there any exceptions to the title report with
21 respect to your bankruptcy?
22 A It was mentioned somewhere in the closing
23 documents, I know that.
24 Q And so just so I'm clear, I'm not going to ask
25 you questions about a document you don't remember

1 reviewing, but to the extent there was a lien
2 release, did it release all claims or did it just
3 release the lien?
4       THE COURT:  Can I make my finding?
5 Well, no, go ahead, I was going to make it on
6 something else.  Go ahead, you're talking about
7 the lien release.
8 A  I don't know the answers to everything that
9 you're asking me.
10 Q  (By Mr. Johnson)  Okay, if you don't know
11 that's -- you don't know.  So is that your
12 answer?
13 A  That's my answer.
14       MR. JOHNSON:  Judge, did you want to
15 interject on a ruling?
16       THE COURT:  Not at this point.  I'll
17 make it later.
18       MR. JOHNSON:  If I may approach, Your
19 Honor.
20       THE COURT:  Please.  And be sure, the
21 clerk needs a copy if you have extra ones of any
22 exhibits.
23 Q  (By Mr. Johnson)  Now, we've talked about the
24 Farmers Group claim number five, what I just
25 handed to you has been designated Citi C4 and

1 I'll represent to you that is claim number five
2 that we pulled from the Court's docket.
3 A  Okay.
4 Q  And if you could turn to page 7 of 9 of that
5 document.
6 A  I see that.
7 Q  And it states down there in bold print:  Personal
8 Guaranty of Mark S. Neighbors dated July 3rd,
9 2009; and then it lists Personal Guaranty of
10 Shelly K. Neighbors dated July 3rd, 2009, under
11 Additional Terms; do you see that?
12 A  Yes.
13 Q  Now, is it your position today that a guaranty
14 dated July 3rd, 2009 does not exist or you just
15 don't believe such guaranties are valid?
16       THE COURT:  Or something else.
17 Q  (By Mr. Johnson)  Or something else?
18 A  We believe we had a guarantee with our
19 corporation, Neighbors Investments.  And there's
20 something -- this personal guaranty on page 9 is
21 illegible, and typing in the language saying that
22 there's a personal guaranty doesn't mean that
23 there's a personal guaranty.
24 Q  I understand that, and that's why I'm asking you,
25 does this refresh your recollection, did a

1 personal guaranty ever exist or is that just an
2 incorrect notation?
3 A  I don't believe a personal guaranty ever existed.
4       MR. JOHNSON:  Thank you.  Your Honor, I
5 would ask that Exhibit C4 be entered which is
6 just proof of claim number five.
7       MR. HOORFAR:  There's no objection,
8 Judge.
9       THE COURT:  Exhibit C4 is admitted.
10 Thank you.
11       (CitiBank Exhibit C4 received in
12       evidence.)
13       MR. JOHNSON:  I have no further
14 redirect.
15       THE COURT:  Ms. Hamilton.
16       MS. HAMILTON:  No, thank you.
17       THE COURT:  Mr. Hoorfar.
18       MR. HOORFAR:  Nothing further, Your
19 Honor.
20       THE COURT:  Okay, I've got a couple of
21 questions.
22       In your Chapter 11, the U.S. Trustee
23 paid -- or filled a proof of claim for quarterly
24 statements, I believe, arising in the Chapter 11,
25 and you testified those were paid.  Were those

1 paid by you personally or someone else?  And if
2 you don't know, that's fine.  But where did the
3 funds come from to pay the U.S. Trustee?
4       THE WITNESS:  I don't recall.
5       THE COURT:  Just on the C -- the
6 settlement statement which is C3, Exhibit C3, the
7 settlement statement, on page 2, line 702, I
8 think I know the answer but it shows a
9 disbursement to Getmeyer Davidson (phonetic) of
10 $13,020.  Were they another real estate agent?
11       THE WITNESS:  Yes.
12       THE COURT:  You were the selling agency
13 and they were the --
14       THE WITNESS:  They were the purchaser's
15 agent.
16       THE COURT:  Okay.  Now, on the
17 settlement agreement -- I believe it's Exhibit
18 C2, which is not the settlement agreement but the
19 modification agreement -- it called for principal
20 and interest payments beginning on March 1, 2015,
21 of I believe it was $915.26, but let me look at
22 that.  Yes, it called for principal and interest
23 payments of $915.26, with the first payment to
24 begin on March 1, 2015, is the way I read it.
25       THE WITNESS:  Yes.

1      THE COURT: So that is -- did you make
2 those -- and you sold it on August 27, 2015?
3      THE WITNESS: Yes, without any
4 incident, want we made all our payments.
5      THE COURT: So my -- if I'm correct,
6 there were six payments due between March 1, 2015
7 and when you sold the property. I mean, I can
8 use my fingers, but March 1, April, May, June,
9 July and August.
10      THE WITNESS: Yeah, approximately.
11      THE COURT: And if my math happens to
12 be -- the interest rate is 4.625 percent --
13      THE WITNESS: Yes.
14      MR. JOHNSON: And if my math is right,
15 that amount on $250,000 is like -- or $200,000,
16 was, I believe it was 97, I can't remember, I can
17 do that math real quick. Yeah, 9,250 a year, and
18 if I divide that. Assuming there were even
19 applications for that six months, but there
20 weren't because it would go -- the principal
21 would go up just a little bit each month and the
22 interest would come down a little bit each month,
23 but divide that by 12 and I get, I get an
24 interest of about $770 a month. And so that
25 would make a principal payment of about 245,

1 which I rounded it up to 250. If you're not
2 following me, tell me.
3      THE WITNESS: Okay. Continue because I
4 don't know where you're going, but -- I hear your
5 calculations, but I don't know where --
6      THE COURT: Well, if my math is right
7 there was only $1,800 worth of principal made
8 between March or -- out of those six payments,
9 about $1,800 of it went to principal.
10      THE WITNESS: Okay.
11      THE COURT: So that would have brought
12 the principal interest or the principal down of
13 the $200,000 down to one hundred and ninety --
14 whatever -- $198,200 but you were only paid
15 $193,000. So I'm asking what the difference,
16 why.
17      THE WITNESS: After the settlement,
18 Nationstar discovered some money somewhere and it
19 was our -- we suspect that it was suspended
20 funds, and that they --
21      THE COURT: Applied it.
22      THE WITNESS: -- applied the additional
23 amount or applied it -- that's right, or they
24 reduced the principal.
25      THE COURT: Okay.

1      THE WITNESS: Yeah.
2      THE COURT: Okay, I have no further
3 questions. And you can cross-examine on what I
4 asked.
5      MR. JOHNSON: I just have one, Your
6 Honor, or some follow-up questions on something
7 you were asking about.
8      THE COURT: Yeah, based on what I did.
9      RECROSS-EXAMINATION
10 BY MR. JOHNSON:
11 Q  Mr. Neighbors, on this modification agreement,
12   and that's Exhibit C2, I think the first modified
13   payment under that and if you need to follow with
14   me, it on page 3 of 7 where it says the
15   modification.
16 A  Give me just a moment here. Where do you want me
17   to go?
18 Q  Go to page 3 of 7.
19 A  Okay.
20 Q  And if you go down to paragraph 3, the
21   modification --
22 A  All right.
23 Q  -- and IT says the first modified -- if you go to
24   the last sentence of paragraph 3, it says: The
25   first modified payment will be due on March 1st,

1   2015.
2 A  Okay.
3 Q  Did you submit a payment on March 1st, 2015?
4 A  Probably.
5 Q  Well, the reason I ask is because your settlement
6   agreement and the modification were all dated in
7   late March, so do you recall, did you prepay?
8 A  Oh, I don't know.
9      MR. HOORFAR: Your Honor, may I
10 interject and clarify?
11      THE COURT: Yes.
12      MR. HOORFAR: Mr. Johnson just
13 refreshed my memory. And I have the worst -- I'm
14 sorry, I'll go to the mic. I have the worst
15 memory, I'll claim that right off the bat. But
16 that I believe this was brought to the attention
17 of Eric Roby of Nationstar at the title company,
18 and if my recollection serves me correctly, I
19 have an e-mail from Mr. Roby stating it's too
20 difficult to change the modification --
21      THE COURT: Actually, that's my
22 recollection of what happened.
23      MR. HOORFAR: I thought we had just
24 verbally changed the date.
25      THE COURT: There was that

Heritage Reporting Service   www.heritagekccmo.com   Page: 42
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 1:21-cv-21003   Doc# 678-1   Filed 10/24/16   Page 42 of 44

1 discussion --
2     MR. HOORFAR: Thank you, Your Honor.
3     THE COURT: -- which I now recall.
4     MR. JOHNSON: Thank you.
5     THE COURT: You don't want to go back
6 and ask the higher ups to change it one more
7 time.
8     MR. JOHNSON: Understood, Your Honor,
9 and obviously we weren't there so, we weren't
10 sure.
11     THE COURT: I actually remember that
12 conversation. I mean, that would -- for what
13 it's worth, that would have cratered the whole
14 deal if he had to go back and ask again.
15 Q (By Mr. Johnson) And I guess just to that
16 point, Your Honor, do we know that, you know,
17 Nationstar entered into this loan modification
18 but did the Freddie Mac or whoever had to
19 approve this, is there any evidence that they
20 had approved this modification?
21 A They had a whole group of people here. I think
22 there was five attorneys and they flew them in
23 from California and Texas and Judge Somers
24 required everybody to be here that was a
25 decision-maker.

1     MR. JOHNSON: Okay, fair enough. That
2 was the one final question, Your Honor.
3     THE COURT: Thank you. Mr. Hoorfar, do
4 you have anything?
5     MR. HOORFAR: Nothing further.
6     THE COURT: Ms. Hamilton?
7     MS. HAMILTON: Nothing.
8     THE COURT: Okay. We are adjourned --
9 well, the record's closed. The evidence is
10 closed.
11     Do I have the authorities that you all
12 talked about in the pleadings that have been
13 filed? I think I probably do, but you talked
14 about some cases, you talked about some cases in
15 your openings for sure, do I have all those
16 cites?
17     MR. JOHNSON: Your Honor, we did add
18 some additional cases on the 305 that was a
19 response that I talked about, and they were cases
20 I think primarily issued from Your Honor. We can
21 certainly provide those.
22     THE COURT: Just provide the cites.
23 You don't need to give me any argument or
24 interpretation, just provide the cites.
25     MR. JOHNSON: Will do, Your Honor.

1     THE COURT: And I'll give you -- you've
2 each got take a week, because we've got a busy
3 week coming up. So within a week, provide me
4 with just a list of the cases that you want me to
5 consider.
6     You all can make closing arguments. I
7 don't think I need them. But you are welcome to
8 make them, and I usually learn something so --
9     MR. HOORFAR: Your Honor, with that
10 being said, if no one else wants to do any
11 closing arguments, I'm fine with that. We've had
12 a long day. I have no problem with closing on
13 what we've just done.
14     THE COURT: Mr. Johnson, I mean, feel
15 free. Don't -- I'm not trying to put a damper on
16 anything.
17     MR. JOHNSON: Your Honor, I guess I
18 somewhat concur with Mr. Hoorfar. I mean, we did
19 provide for post-trial briefings in the order. I
20 don't know if you want them.
21     THE COURT: If you want to file one,
22 fine. But I just -- what I want to see is the
23 authorities that you referred to.
24     MR. JOHNSON: And I guess --
25     THE COURT: I'll give you post trial

1 briefing if you want it.
2     MR. JOHNSON: Your Honor, with
3 providing cites, the only thing I would add that
4 would be addressed is the code itself, and that's
5 just 502a, that are calls that are filed and
6 aren't objected to are deemed allowed.
7     THE COURT: Ms. Hamilton?
8     MS. HAMILTON: I don't have anything to
9 add this afternoon, Your Honor.
10     THE COURT: Okay. Thank you. Thank
11 you, Mr. Neighbors. If there's nothing else,
12 we're adjourned and I've got -- wait, wait, wait.
13 Okay.
14     There is a request that you,
15 Ms. Hamilton, and Mr. Johnson, tell us how they
16 think they've proven there are additional
17 creditors.
18     MR. JOHNSON: Your Honor, ultimately we
19 may file a very short brief to these points so I
20 can give a little bit. Obviously, we've just
21 been given the settlement agreements, we've got
22 to wrap our brains around that.
23     THE COURT: If you want to do it in
24 writing, that's fine.
25     MR. JOHNSON: Your Honor, I guess I'd

Heritage Reporting Service   www.heritageekcmo.com   Page: 43
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701
Case 11-21003  Doc# 678-1  Filed 10/24/16  Page 43 of 44

1  prefer to do it that way.
2      THE COURT:  Limit it to about ten
3  pages, please.
4      MR. JOHNSON:  Absolutely.  Thank you,
5  Your Honor.
6      THE COURT:  And two weeks for that.
7  And Mr. Hoorfar, you've got two weeks to respond.
8      MR. HOORFAR:  That's fine, Your Honor.
9      THE COURT:  Thank you.
10     MR. JOHNSON:  Thank you.
11     MS. HAMILTON:  Thank you.
12     MR. HOORFAR:  Thank you.
13     THE COURT:  With that, we are now
14 adjourned.
15     (Hearing concluded.)
16
17
18
19
20
21
22
23
24
25

1          CERTIFICATE
2  STATE OF KANSAS      )
3  COUNTY OF WYANDOTTE  )
4     I, R. PATRICK TATE, a Certified Court
5  Reporter, do certify that pursuant to Notice at
   Robert J. Dole Federal Courthouse, 500 State
6  Street, Kansas City, Kansas, the above-entitled
   matter came on for hearing, and the preceeding
7  170 pages constitute a true and correct
   transcription of my stenographic notes then and
8  there taken.
9     I further certify that I am not
   counsel, attorney, or relative of any party,
10 or clerk or stenographer of any party, or
   otherwise interested in the event of this suit.
11
12     IN TESTIMONY WHEREOF, I have hereunto set my
   hand and seal this 7th of October, 2016.
13
14
15          /s/R. Patrick Tate
            Missouri C.C.R. 1239
16          Kansas C.C.R. 1608
17
18
19
20
21
22
23
24
25

Heritage Reporting Service      www.heritagekcmo.com      Page: 44
1100 Main Street, Suite 1880, Kansas City, Missouri 64105 - 816-384-0701

Case 15-21003   Doc# 678-1   Filed 10/14/16   Page 44 of 44